[Crim. No. 3558. Fifth Dist. Feb. 29, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE DANIEL WILLIAMS, Defendant and Appellant.

**COUNSEL**

Paul Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, Richard E. Shapiro, Mark L. Christiansen, Manuel M. Medeiros and Roy Dahlberg, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Paul H. Dobson and John R. Duree, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BALLANTYNE, J.\*—**

### STATEMENT OF THE CASE

Appellant stands convicted, following a jury trial, of attempted voluntary manslaughter, assault with a deadly weapon, and discharging a firearm at an occupied motor vehicle. He contends the conviction of attempted voluntary manslaughter must be reversed because commission of that crime is a logical impossibility. He also argues the conviction of assault with a deadly weapon must be reversed because the jury was erroneously instructed that the doctrine of transferred intent was applicable under the facts of this case. He further contends his conviction of discharging a firearm into an occupied motor vehicle must be reversed because the trial judge erroneously instructed on the mental element of that crime. Additionally, he asserts he was deprived of effective assistance of counsel because his attorney failed to subpena a critical witness. Finally, he maintains the trial judge erred prejudicially by admitting evidence of a statement made by the victim which did not fall within a recognized exception to the hearsay rule. For the reasons to be explained, we conclude the judgment must be reversed as to the conviction of assault with a deadly weapon and remanded for resentencing. In all other respects, the judgment will be affirmed.

### THE EVIDENCE

Robert Mikel testified that on August 27, 1977, he was shot in the forehead by appellant. A hostile relationship had existed between appellant and Mikel for several months prior to this shooting; the hostility stemmed from appellant's relationship with Mikel's daughter Lavella. Lavella had given birth to a child fathered by appellant, but the couple's relationship had deteriorated and a temporary restraining order had been issued to prevent appellant from visiting Lavella at the Mikel residence. Lavella testified that on one occasion when appellant came to the Mikel residence her father had pointed a gun towards appellant. Appellant had also threatened to harm Mikel and had told Lavella he would harass her father to death.

---

*Assigned by the Chairperson of the Judicial Council.

Regarding the shooting on August 27, 1977, appellant and Mikel gave different accounts of who initiated the incident. Mikel testified that appellant, without any provocation, fired at him from a vehicle stopped at the intersection of Fig and Church Streets in Fresno, California. Mikel said when the shooting started, he was making a U-turn in his own vehicle to avoid contact with appellant who was sitting in his automobile across the intersection. Mikel suspected appellant was "up to something" because appellant was not driving his automobile through the intersection, but was just sitting there grinning at Mikel and motioning him across the street.

The evidence showed a number of shots were fired at Mikel's vehicle, damaging the tires, fenders, hood and windshield and wounding Mikel in the forehead. There were also two other people in Mikel's vehicle, James Pullen and Mikel's two-year-old grandson, neither of whom were hit by a bullet.

Mikel testified, and Pullen agreed, that Mikel had done nothing aggressive to precipitate the shooting. Mikel acknowledged at trial that he had a loaded gun in his car when the shooting occurred, but he said he never reached for the gun because he didn't even remember he had it with him. According to Mikel's trial testimony, he had placed the gun in his car when he went fishing about four or five days before this incident. However, a prior inconsistent statement by Mikel at the preliminary hearing contradicted that testimony. Mikel's earlier story was that he only put the gun in his car a couple of hours before the shooting incident.

James Pullen, one of the passengers in Mikel's car, testified, essentially confirming Mikel's account of the shooting. (Pullen had been Mikel's friend for about 24 years.) Pullen testified that he never saw Mikel pull a gun from underneath the car seat; nor did Pullen see Mikel point or shoot a gun that day.

Three women also witnessed the shooting from their car which pulled into the intersection behind Mikel. Janette Holly, Phyllis Warren and Alice Grant all testified they had seen appellant sitting in his car at the intersection and that he had fired a rifle several times at a car containing two men and a child. The latter vehicle was turning in the

intersection when fired upon. None of the women saw anyone in the latter vehicle do anything aggressive or hostile towards appellant.

Fresno police officers arrived at the scene in time to observe appellant running with his rifle towards some nearby apartments. The officers were unable to catch appellant, but they did find the rifle which he left at the apartments near the scene of the shooting. Appellant later turned himself in to the police after he learned they were looking for him.

Police officers examined Mikel's vehicle as well as the vehicle driven by appellant. No bullet holes were found in appellant's car, whereas Mikel's vehicle suffered extensive damage.

Appellant sought to establish that he fired the shots in self-defense. He testified that earlier on the day of the shooting, Mikel had driven by his residence and threatened him with a gun.[1] Appellant testified that when the two vehicles met at the intersection of Fig and Church just prior to the shooting, it was Mikel—not appellant—who refused to go through the intersection when he could have done so. Appellant testified that he first heard a gunshot while Mikel's vehicle was making a U-turn. According to appellant, Mikel began shooting at him before appellant grabbed his rifle and returned the fire. Appellant said the two men each fired a number of shots.[2]

Appellant said he aimed only for the Mikel car, not the people in it; he said he only wanted Mikel to back off. His explanation as to why he left the scene and discarded his rifle, rather than confronting the police and explaining what had happened, was that he was confused and afraid of the police because he had almost been murdered by police once before when he was innocent.

Based on the foregoing evidence, the jury found appellant guilty of attempted voluntary manslaughter as to Mikel, assault with a deadly weapon against Pullen and Mikel's grandson, and discharging a firearm into a motor vehicle.

---

[1]Mikel had acknowledged that he and Mike Chaney drove by appellant's house earlier on the day of the shooting; however, Mikel denied pulling a gun on appellant at that time.

[2]Appellant acknowledged neither he nor his vehicle were hit by any bullets.

## DISCUSSION

*Whether appellant's conviction of attempted voluntary manslaughter must be reversed because there is no such crime.*

Appellant was charged with attempted murder; at appellant's request, the jury was also instructed on the lesser included offense of attempted voluntary manslaughter.[3] Since appellant requested these instructions, he is precluded from objecting to them on appeal, under the doctrine of invited error. (See Witkin, Cal. Criminal Procedure (1963) § 491, pp. 496-497.)

Moreover, we reject appellant's contention that commission of attempted voluntary manslaughter is a logical impossibility. The thrust of appellant's argument is that the heat of passion which is an element of voluntary manslaughter precludes formation of the specific intent necessary for a criminal attempt. Appellant cites no California authority directly supporting his position; however, he does rely on a passage from Perkins on Criminal Law (2d ed. 1969) page 575. Perkins notes that there is authority in some jurisdictions holding that there is no such crime as an attempt to commit voluntary manslaughter because "[t]he act arising from sudden passion lacks the calculation required for an attempt" (*id.*, at p. 575, fn. 11). Appellant quoted selectively from Perkins' comments on this subject. He failed to note that Perkins stated: "The position that there can be no such crime as an attempt to commit voluntary manslaughter seems questionable" (*ibid.*).

While we find no California case in which this issue was directly decided, several recent decisions have recognized the existence of this offense (see, e.g., *People v. Heffington* (1973) 32 Cal.App.3d 1, 11-12

---

[3]At appellant's request the trial judge gave the following version of CALJIC No. 17.10: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the offense of attempted murder charged, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish his guilt of such lesser offense beyond a reasonable doubt. [¶] The offense of attempted murder with which the defendant is charged in Count 1 necessarily includes the lesser offense of attempted voluntary manslaughter."

Also at appellant's request, the judge gave the following modified version of CALJIC No. 8.40: "Attempted voluntary manslaughter is the intentional and unlawful attempted killing of a human being without malice aforethought. [¶] There is no malice aforethought if the attempted killing occurred upon a sudden quarrel or heat of passion."

[107 Cal.Rptr. 859], holding that attempted voluntary manslaughter was a lesser included offense in a trial for violating Penal Code section 217, attempted murder, and requiring instructions on the lesser offense; accord *People* v. *Stevenson* (1978) 79 Cal.App.3d 976, 987 [145 Cal. Rptr. 301]). We conclude appellant's conviction of attempted voluntary manslaughter is valid.

■ *Whether appellant's conviction of assault with a deadly weapon must be reversed because it was erroneously based upon the fiction of transferred intent.*

Appellant next contends this court must reverse his conviction of assault with a deadly weapon upon James Pullen and Robert Mikel, Jr., because it was error to instruct the jury in the language of CALJIC No. 9.06 under the facts of the present case. The instruction read to the jury provides as follows: "Where one intends to [unlawfully] assault a certain person with a deadly weapon, but by mistake or inadvertence assaults a different person with such weapon, the crime, if any, so committed is the same as though the person originally intended to be assaulted had been assaulted." (CALJIC No. 9.06, as modified.) Appellant contends it is erroneous to give this instruction which he calls a "transferred intent" instruction when there has been no completed battery against the unintended victim. Appellant cites old English cases and commentary from Prosser[4] to demonstrate that the doctrine of transferred intent was developed for the purpose of redressing physical injury. Appellant asserts if this doctrine were applicable to an assault where there is no injury to the victim, the actor could be held criminally liable for assault upon everyone who happened to be nearby, because an assault with a deadly weapon can be committed even though the "victim" is unaware of the threat (see *People* v. *Pape* (1885) 66 Cal. 366 [5 P. 621]). Indeed, as appellant points out, without an injury there is no limitation as to whom any wrongful intent could be transferred. The cases dealing with the literal doctrine of "transferred intent" *invariably* involve physical injury to an unintended victim.

An assault has been defined by our Supreme Court as "an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another, or in other words, it is an attempt to commit a battery." (*People* v. *Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172,

---

[4]See Prosser, *Transferred Intent* (1967) 45 Texas L.Rev. 650, where the doctrine is referred to as an "arrant barefaced fiction."

479 P.2d 372].) Although assault with a deadly weapon is not a specific intent crime under the *Rocha* holding, it nevertheless may not be committed by mere reckless conduct alone (*id.*, at p. 898). In the present case, appellant's recklessness in shooting towards a car occupied by three people cannot per se constitute a criminal assault as to all those three people. In order to find a criminal assault, appellant must have intended to commit a battery, under the holding of *Rocha*. Although the evidence of hostility between appellant and Mikel could readily give rise to an inference of intent to commit a battery against Mikel, CALJIC No. 9.06 may have led the jury to find an assault against Pullen and the child without finding an intent to commit a battery against either of them. We agree with appellant's assertion that if he is to be convicted of assault with a deadly weapon upon James Pullen and Robert Mikel, Jr., that conviction must stand upon an examination of his intent vis-à-vis those particular individuals.

Respondent concedes that the doctrine of "transferred intent" in its strict terms has no applicability to an assault case where the victim is not injured. However, respondent maintains the trial court properly instructed in the language of CALJIC No. 9.06, because that instruction does not merely restate the doctrine of transferred intent, but is in fact broader than that doctrine. Respondent contends CALJIC No. 9.06 applies to a case where a defendant shoots at X, believing him to be Y—the "mistaken identity" situation, rather than the "bad aim" situation.[5] We agree with respondent that CALJIC No. 9.06 does cover the "mistaken identity" fact pattern (see, e.g., *People* v. *Wells* (1904) 145 Cal. 138 [78 P. 470], a case of "mistaken identity" where the court used language very similar to that of CALJIC No. 9.06). However, we do not agree that the evidence in the present case supported the giving of the instruction under that theory.

In our view, the evidence in this case does not fall within the "mistaken identity" type of fact pattern present in *People* v. *Wells, supra.* The prosecution did not attempt to prove or argue below that appellant shot at either Pullen or Mikel's grandson in the erroneous belief he was

---

[5]LaFave and Scott, in their treatise on criminal law, use the phrases "bad aim" and "mistaken identity" to describe two different types of situations where a defendant can be held liable for harm to an unintended victim (LaFave & Scott, Criminal Law (1972) pp. 252-255). Literally speaking, the "mistaken identity" situation is not a case of transferred intent, because the target at which defendant actually aimed is the victim. In contrast, the "bad aim" situation—where a defendant aims at X and hits Y by mistake—does require an actual transfer of intent.

shooting at Mikel. The notion that appellant mistook the two-year-old child for Mikel strains credibility. Moreover, appellant's testimony establishes that he distinguished among the three passengers. He stated that he saw the child standing in the backseat, and that he saw Pullen jump from the opposite side of the car. Accordingly, we reject respondent's argument that the giving of CALJIC No. 9.06 could be based on evidence that appellant inadvertently aimed at Pullen or the child, believing them to be the intended victim Mikel.

■ We conclude that CALJIC No. 9.06 should only be given where the defendant actually commits an assault against the wrong person, due to mistaken identity (see, e.g., *People* v. *Wells, supra,* 145 Cal. 138) or where the defendant intends to commit an assault against one party, but through faulty aim, actually causes some physical harm to another person (see, e.g., *People* v. *Sutic* (1953) 41 Cal.2d 483, 488 [261 P.2d 241] and see comment to CALJIC No. 9.06 (4th ed. 1979)). ■ Since the present case did not involve either of those situations, it was error to give the instruction.

We hold that under the circumstances there is a reasonable probability that the jury was misled. After hearing CALJIC No. 9.06 and the arguments of the prosecutor, the jury could have convicted appellant of assaulting Pullen and Mikel, Jr., without examining his intent toward those particular victims.[6] This was not a proper case for such a transfer of intent to unintended victims. Hence, the giving of the instruction was prejudicial.

■ *Whether appellant's conviction of discharging a firearm into an automobile must be reversed because the jury instructions on the mens rea for that crime were erroneous*

Appellant contends his conviction of violating Penal Code section 246 must be reversed because the court erroneously instructed the jury on

---

[6]The prosecutor made the following statement during argument to the jury: "Another area that you are going to get some guidelines in is what we refer to as transferred intent. Some of you might wonder well, how can a person be guilty of assaulting, say, a passenger in that car or little Robert Mikel, Jr. if the person was mainly concerned with the driver.

"Well, under the law you will be instructed that where a person intends to assault *one person and by misfortune or inadvertence or a mistake he assaults another person,* well the law transfers that intent. It's just as if it was an assault against the first person."

the mental element of that crime. Penal Code section 246 provides in pertinent part: "Any person who shall *maliciously and willfully* discharge a firearm at an...occupied motor vehicle...is guilty of a felony ...." (Italics added.) Appellant contends that this is a specific intent crime and that the trial judge made two errors in instructing on the requisite mental state for this offense. Appellant argues that the judge erred by instructing this was a general intent crime. He also contends the trial judge erred by failing to give a *sua sponte* instruction defining the element of malice.

When a defendant is charged with a specific intent crime, the trial judge has a *sua sponte* obligation to instruct on that specific intent (*People* v. *Ford* (1964) 60 Cal.2d 772, 792-793 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Turner* (1971) 22 Cal.App.3d 174, 184 [99 Cal. Rptr. 186]). However, respondent contends that violation of Penal Code section 246 is not a specific intent crime and that the word "malicious," as used within the statute, requires only a deliberate and intentional act as opposed to an accidental firing. According to respondent it was unnecessary to give a separate instruction on malice and the trial court properly instructed the jury this was a general intent crime.

Neither side has cited a case squarely deciding whether violation of section 246 is a general or specific intent crime. Our Supreme Court has observed in passing that section 246 is a general intent crime (see *People* v. *Hoover* (1974) 12 Cal.3d 875, 882, fn. 5 [117 Cal.Rptr. 672, 528 P.2d 760]). In *People* v. *Chavira* (1970) 3 Cal.App.3d 988 [83 Cal. Rptr. 851], it was held that the requisite mental state for a violation of Penal Code section 246 may be evidenced by only a reckless disregard of probable consequences by the defendant[7] (*id.*, at p. 993; see also Los Angeles Superior Court Criminal Trial Court's Benchbook, p. 337). The language of section 246 does not require a conclusion it is a specific intent crime. "Willfully," "knowingly" and "maliciously" are normally expressions of mental states in general criminal intent (see 2 CALJIC (4th ed. 1979) appen. D, p. 351). Therefore, we conclude the trial court properly instructed the jury this was a general intent crime.

Appellant also argues the court should have given, on its own motion, an instruction defining "malicious." He points out that Penal Code sec-

---

[7]In *Chavira*, the trial court instructed the jury that section 246 was a specific intent offense. However, the appellate court did not comment on the propriety of that instruction (*id.*, at p. 993, fn. 3).

tion 7, defining words and phrases used within the code, provides: "[t]he words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act. . . ." Appellant contends such an instruction should have been given because the court has a *sua sponte* duty to instruct on elements of the crime. Assuming arguendo that an instruction defining malice should have been given, the absence of such an instruction did not prejudice appellant. Here, the jury clearly resolved the issue adversely to appellant under other proper instructions (cf. *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913]). In rejecting appellant's self-defense theory and in finding him guilty of attempted voluntary manslaughter, the jury necessarily found he fired at the car with a "malicious" intent as defined in Penal Code section 7, quoted above.

*Whether appellant was deprived of effective assistance of counsel because his attorney failed to subpena a critical witness.*

Appellant contends he was denied effective assistance of counsel because his attorney was negligent in failing to secure the attendance of a critical defense witness at trial. In order to prevail on his claim of ineffective assistance of counsel, appellant must show that his attorney failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. Appellant must also show that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859]). We conclude appellant failed to sustain this burden.

First, it is very questionable whether the record supports appellant's claim that his attorney failed to act with reasonable competence and/or diligence to locate the desired witness, Michael Chaney.[8] Appellant's counsel told the trial judge at a hearing out of presence of the jury the reasons why he had not obtained a subpena for Chaney. Defense counsel believed Chaney was in Toledo, Ohio, during the time period before

---

[8]Michael Chaney was a passenger in Mikel's car, when Mikel drove by appellant's house earlier on the day of the offense. If Chaney had been brought to trial, he could have testified as to whether Mikel threatened appellant with a weapon at that time. Although appellant said Mikel had threatened him at that time, Mikel denied making such a threat.

trial. The deputy district attorney acknowledged he had probably told defense counsel that Chaney was out of state, based on information the prosecutor had received from his witnesses. On the night before the final day of appellant's trial, defense counsel received information that Chaney was indeed in Fresno and was locally employed. Starting early the next morning defense counsel attempted to contact Chaney at his work location. When defense counsel reached Chaney, he asked Chaney to come to court on his own. Chaney refused to do so until he spoke with the victim Mikel. When it became apparent Chaney would not testify voluntarily, defense counsel had an investigator go to Chaney's work place to serve him with a subpena. When these efforts failed because Chaney did not appear at work, defense counsel requested a continuance on the last day of trial; the continuance was denied.

It appears appellant's attorney initially acted on a reasonable belief that Chaney was out of state. As soon as he learned Chaney was in Fresno, defense counsel took reasonable steps to bring Chaney to court. Consequently, the record does not demonstrate incompetence or lack of diligence.

Moreover, appellant has failed to show that Chaney's absence deprived him of a potentially meritorious defense. The record does not disclose whether Chaney would have corroborated appellant's testimony that Mikel had threatened him earlier on the day of the shooting, or sided with Mikel's story that there had been no such threats. Defense counsel told the court he had "no idea how [Chaney] would testify." It is quite likely that Chaney's testimony would have been harmful to appellant, because Chaney was Mikel's friend, and Chaney said he wanted to speak with Mikel before giving any testimony. Even assuming Chaney would have testified favorably to appellant, such testimony would not have directly substantiated appellant's self-defense theory which turned on the question of whether *at the time of the shooting incident*, Mikel threatened appellant first. Threats by Mikel earlier that day would not have justified appellant in firing at Mikel after the danger had passed (*People* v. *Perez* (1970) 12 Cal.App.3d 232, 236 [90 Cal.Rptr. 521]).

Chaney's testimony, even if favorable to appellant, would have contributed little to appellant's defense. Chaney's testimony was not necessary to counter Mikel's denial that he had ever threatened appellant

with a gun. Mikel's daughter Lavella testified her father had threatened appellant, and it was clear, even without Chaney's testimony, that Mikel had a high degree of hostility towards appellant. Therefore, at best Chaney's testimony would have only been cumulative.

Even if Chaney's testimony had damaged Mikel's credibility in the eyes of the jurors, it is unlikely they would have accepted appellant's version of the incident over Mikel's. There were four other witnesses who testified Mikel had made no aggressive overtures towards appellant just before the shooting began. Thus, we conclude that Chaney's absence did not deprive appellant of a potentially meritorious defense. Appellant has failed to demonstrate ineffective assistance of counsel.

Appellant also impliedly contends the trial court should have granted a continuance to allow further efforts to produce Chaney. ■ A trial judge is not required to grant a continuance to allow a defendant to obtain a witness, unless the defendant shows the materiality of the anticipated evidence and the necessity of such evidence. (See generally, Witkin, Cal. Criminal Procedure, *supra*, §§ 280-283, pp. 272-277; see also *People* v. *Livingston* (1970) 4 Cal.App.3d 251, 255 [84 Cal.Rptr. 237].) ■ There was no abuse of discretion in the denial of a continuance here, because, for the reasons explained above, Chaney's anticipated testimony was not sufficiently important to the defense.

■ *Whether a statement Mikel made to Alice Grant was inadmissible hearsay.*

Appellant contends the trial court erred by admitting evidence of a statement Mikel made to Alice Grant shortly after the shooting incident. Ms. Grant was allowed to testify, over defense objection, that Mikel told her he wished he had a gun. The prosecution relied below on the spontaneous declaration exception to the hearsay rule to make this testimony admissible. To lay a foundation for this exception, the prosecution elicited that the statement was made about two minutes after the shooting, and that the only thing Mikel said prior to this statement was to tell Ms. Grant he had been shot. The trial court ruled that this was an adequate foundation to make Mikel's statement to Ms. Grant admissible.

Appellant argues that this statement is inadmissible under the spon-

taneous declaration exception because it does not purport to "narrate, describe, or explain an act, condition or event perceived by the declarant."[9] It is a close question whether or not this statement explained the shooting perceived by the declarant. We find that it does in the sense that Mikel's statement suggests the shooting was unprovoked and unretaliated. The trial judge is vested with some discretion in determining the existence of the essential elements of admissibility under this hearsay exception (*Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 273 [129 Cal.Rptr. 146]). Here, the trial court acted within its discretion in admitting the statement under the spontaneous declaration exception.

Moreover, the statement was also admissible under Evidence Code section 791 providing an exception for "prior consistent statements." That section provides in pertinent part: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement...."

The statement in question was admissible under this exception because: 1) it was consistent with Mikel's trial testimony that he had forgotten he had a gun in the car; and 2) because it preceded the inconsistent preliminary hearing testimony used to impeach Mikel, i.e., that he had placed the gun in his car only a few hours before the shooting incident. Although the trial judge did not state he was relying on this exception in admitting the evidence, the judge's decision may be upheld on an alternate theory of admissibility (see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 226, pp. 4215-4216). We conclude there was no error in admitting Mikel's prior statement.

The judgments of conviction are affirmed as to counts one and four and reversed as to count three. Since count three was designated as the

---

[9] Evidence Code section 1240, establishing this exception, provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

principal term, the case is ordered remanded for a new sentence hearing.

Brown (G. A.), P. J., and Zenovich, J., concurred.