[Crim. No. 13414. Fourth Dist., Div. One. Nov. 2, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS JOSEPH TUCCIARONE, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Kenyon C. Keller and Jeffrey J. Stuetz, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ZUMWALT, J.**[*]—A jury convicted Thomas Joseph Tucciarone of attempted murder with a knife causing great bodily injury (Pen. Code,[1] §§ 664/187, 12022, subd. (b), 12022.7), assault with a deadly weapon causing great bodily injury (§§ 245, subd. (a), 12022.7), mayhem (§ 203), exhibiting a deadly weapon in a threatening manner (§ 417), and assault with a deadly weapon (§ 245, subd. (a)). He was sentenced on the attempted murder count to seven years in prison plus three years enhancement. Sentences on counts two and three were stayed under section 654 and sentences on counts four and five made concurrent.

Tucciarone appeals, meritoriously contending the court erred in refusing his requested jury instruction on attempted voluntary manslaughter. He also contends his sentence on the attempted murder conviction is unconstitutional and the court erred in failing to give other instructions *sua sponte*.

Thomas and Marlene Tucciarone had separated after a stormy four-year marriage. They had had problems of physical abuse, his inability to hold a job and family problems. On December 21, 1980, they met and talked. They argued. He threatened to kill both himself and Marlene, saying he could not go on living. Marlene calmed him down and they returned to a parking lot to get his car. They argued again and Thomas took a knife from his jacket pocket and put it on the seat beside him. She was very frightened. He apologized, put the knife away and asked Marlene not to tell anyone. She asked him to see Dr. Hardison (a psychologist they had seen for their marital troubles) and he agreed.

Marlene went to work at the library the next day. Thomas came in about 3 p.m. and spoke with her. She lied to him about the time she got off work,

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code unless otherwise specified.

hoping he would leave, but he did not. When it was time for Marlene to leave the library, she asked a friend, Brenda, to walk out with her. When they were outside about five feet, Thomas came up behind Marlene, pulled Brenda's arm off her shoulder and stabbed Marlene in the back. She tried to protect herself with her arms, he cut her hands and arm. She fell to the ground. He held her arm and stabbed her in the chest and abdomen. He also cut both sides of her throat. She had 14 stab wounds.

During the attack, Richard Bledsoe and Dr. Tiffany ran out of the library. Bledsoe saw Thomas standing or kneeling over Marlene, stabbing her. Thomas stood up, held up the knife and dared Bledsoe to come closer than the four to five feet he was. Bledsoe backed off. Thomas then pushed the blade into Marlene's abdomen four or five times. He slowly ran or jogged away, followed by Bledsoe and Tiffany at a safe distance, about 25 feet. Thomas turned and ran at Bledsoe with the knife extended, yelling "I have nothing to lose." He then fled.

Tucciarone presented a diminished capacity defense. In 1968, he suffered a severe brain injury. Psychologist Lloyd Jacobsen testified neurological testing showed a significant disorder in brain function—"mild chronic and scattered form of cerebral dysfunction." He found Tucciarone "suffering from an abnormal state of mind . . . which most probably operated to prevent him from forming a specific mental intent to commit murder in this case." He had a personality disorder attributed to brain dysfunction.

Psychiatrist Randall Read found it "unlikely he [Tucciarone] had the capacity for specific intent" to kill. Dr. Read found the brain injury, the preexisting personality problems and stress of this unique incident "led to a diminished function of capacity . . . to impair the capacity to form specific intent."

Tucciarone's two former wives testified in rebuttal he had abused them to refute his contention of personality change after his accident.

The court refused to give Tucciarone's requested attempted voluntary manslaughter instruction. He contends the court erred in relying on *People* v. *Otis* (1980) 111 Cal.App.3d 467 [168 Cal.Rptr. 708], in finding there was no crime of attempted voluntary manslaughter. In answering this contention, the People, rather than contending attempted voluntary manslaughter is not a crime, argue Tucciarone did not offer sufficient evidence to negate the element of malice and the refusal to give the instruction was therefore proper.

Defense counsel, citing *People* v. *Heffington* (1973) 32 Cal.App.3d 1, 11 [107 Cal.Rptr. 859], and *People* v. *Williams* (1980) 102 Cal.App.3d 1018 [162 Cal.Rptr. 748], asked for attempted voluntary manslaughter as a lesser in-

cluded offense of the charged attempt to commit murder. The issue was put squarely by counsel, "If the jury believes there was intent to kill with no malice aforethought they may make this a guilty of attempt to commit voluntary manslaughter."

The court gave instructions on diminished capacity but refused to instruct on attempted voluntary manslaughter. The court, citing *Otis* (*supra*, 111 Cal.App.3d 467) and the now repealed Penal Code section 217, said "I believe that the legislative scheme is assault with a deadly weapon. Penal Code section 245, sub A, covers the situation adequately."

The court also found in regard to negation of a possible finding of malice aforethought, "There has been no showing in this case of the possibility of an imperfect defense . . . and no showing of heat of passion or provocation, such as would negate malice aforethought."

It is clear the jury rejected Tucciarone's contention he could not form the specific intent to kill, for it convicted him of attempted murder. But even though the jury found intent to kill, if there was evidence from which the jury could have concluded Tucciarone did not have the requisite malice, the jury should have been so instructed (*People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Stevenson* (1978) 79 Cal.App.3d 976 [145 Cal.Rptr. 301]). Voluntary manslaughter requires a showing of intent to kill but not malice aforethought (§§ 187, 192; *People* v. *Heffington, supra*, 32 Cal.App.3d 1, 11).

We do not find *Otis* dispositive. *Otis* dealt with the now repealed Penal Code section 217 (assault with intent to commit murder), not the crime of attempted murder. While the distinction may be overly fine, the legislative scheme now rests on the attempt statute and the substantive law statutes.

We see no reasonable basis for finding there is no crime of attempted voluntary manslaughter in the current statutory scheme. Tucciarone cites other states which have recognized it as a crime. The *Otis* court itself entertained some doubt about its position on the offense of assault with intent to commit manslaughter, saying, " 'If such a crime exists it would of necessity be assault with intent to commit *voluntary* manslaughter' " (*People* v. *Otis, supra*, 111 Cal.App.3d 467, 473).

California courts have treated the crime as if it exists. In *People* v. *Williams, supra*, 102 Cal.App.3d 1018, 1025-1026, the court upheld a conviction of attempted voluntary manslaughter in the face of a challenge there was no such crime. In fairness, it should be noted the defendant had requested instructions on the point and was precluded from objecting because of invited error. The

court in *People* v. *Heffington, supra,* 32 Cal.App.3d 1, 10-12, found the trial court erred in not *sua sponte* instructing the jury on attempted voluntary manslaughter as "a lesser included offense punishable under Penal Code section 664 rather than section 217" (*id.,* at p. 12; see also *People* v. *Wilson* (1976) 62 Cal.App.3d 370 [132 Cal.Rptr. 813]). In *People* v. *Ibarra* (1982) 134 Cal.App.3d 413 [184 Cal.Rptr. 639], this court affirmed a conviction of attempted voluntary manslaughter.

We also note the People do not argue the matter.

■ The next question is whether Tucciarone presented any evidence which might negate malice and support a jury verdict of manslaughter.

Dr. Jacobsen found Tucciarone has a form of schizophrenia "combined with passive-aggressive-dependent personality features." He testified "these kinds of men have been noted to demonstrate . . . overreaction to any kind of interpersonal rejection. But particularly rejection by a woman. . . . [If] they fail to maintain their status with a woman . . . they can become very agitated, and feel panicky, and confused, and angry, and under the circumstances there is a significant possibility of dangerous assaultive or self-destructive behavior." He stated, "there is a significant probability . . . the schizomanic features . . . were related to the head trauma; if Tucciarone felt 'in danger of rejection by other people' . . . these feelings of accumulated anger and rage could emerge in the form of . . . assaultive behavior . . . he would have great difficulty controlling. It would be an impulsive kind of explosive outburst." Dr. Jacobsen found suggestion of "an impairment of his ability to accurately determine reality."

He found injuries to Tucciarone's brain including some dysfunction of the frontal lobe which mediates logical reasoning ability.

During the psychological testing, Tucciarone showed "an emotionally unstable state . . . beyond that demonstrated by most individuals in this situation," which Jacobsen attributed to personality disorder and brain dysfunction. He was uncertain whether Tucciarone could conform his conduct to the requirements of the law.

Dr. Read testified, "I think he had a general willingness to hurt her; to hurt her because he was hurt, and he was angry at her, and he was confused." He felt Tucciarone did not have a specific plan to cause severe injury.

If, however, malice can be so clearly implied a jury could not have found otherwise, the court had no duty to give the instruction.

■ Malice can be inferred from the viciousness of the attack or from the act itself (see Witkin, Cal. Crimes (1978 supp. to vol. 1) p. 309).

Three tests for properly implying malice are set out in *People* v. *Poddar* (1974) 10 Cal.3d 750, 759-760 [111 Cal.Rptr. 910, 518 P.2d 342], "First, was the act . . . done for a base antisocial purpose? Second, was the accused aware of the duty imposed upon him not to commit acts which involve the risk of grave injury or death? Third, if so, did he act despite that awareness? . . . . In order to make a proper finding of malice aforethought all three of the foregoing inquiries must be answered in the affirmative and as to *each* inquiry evidence of a diminished capacity must be weighed in the balance."

■ The testimony of Drs. Jacobsen and Read, when considered with the facts, provides sufficient bases to conclude a jury might have found the requisite malice for attempted murder missing had the requested instruction been given.

The jury could have combined its conclusion of intent to kill with a lack of malice to make the maximum offense attempted voluntary manslaughter (see *People* v. *Fusselman* (1975) 46 Cal.App.3d 289, 299 [120 Cal.Rptr. 282]). A person may intentionally kill without justification or excuse and not have malice aforethought, thus being guilty of voluntary manslaughter (*People* v. *Conley* (1966) 64 Cal.2d 310, 318 [49 Cal.Rptr. 815, 411 P.2d 911]).

In the recent case of *People* v. *Wickersham* (1982) 32 Cal.3d 307 [185 Cal.Rptr. 436, 650 P.2d 311] the Supreme Court reversed for lack of a *sua sponte* voluntary manslaughter instruction where "no instruction presented the jury with a theory of intentional homicide which was not premeditated to deliberate. Once the jury found that the killing was intentional, it had no choice but to return a verdict of first degree murder" (32 Cal.3d at p. 336). In addition, "[a] requested instruction by defendant must be given where evidence exists on that issue [citations]" (*People* v. *Rivera* (1981) 127 Cal.App.3d 136, 153 [179 Cal.Rptr. 384]).

There is evidence which might support a manslaughter verdict and Tucciarone was entitled to the instruction for which he asked (*People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]).

We note the jury was very attentive and asked questions of the court. Jurors were obviously carefully following the testimony about Tucciarone's mental state.

Because the case must be reversed for lack of the requested instruction, we do not reach Tucciarone's argument he was denied equal protection of the law

in his sentencing, nor do we reach the question of whether his sentence was cruel and/or unusual.

■ Tucciarone's contention the court erred in failing to *sua sponte* give limiting instructions regarding his physical abuse of his wives is unmeritorious. Calling the witnesses was proper rebuttal to impeach Tucciarone's mother's evidence that his behavior changed after the accident. The alleged past offenses were not a "dominant part of the evidence," nor were they highly prejudicial. The court was under no duty to give any such instruction *sua sponte* (*People* v. *Collie* (1981) 30 Cal.3d 43, 64 [177 Cal.Rptr. 458, 634 P.2d 534]).

■ Finally, the court did not err in failing to give, *sua sponte,* an instruction requiring the jury to agree on which of three separate and distinct acts it relied upon in the assault with the knife on Bledsoe. The acts were in fact one course of conduct, happening in a short time, a close distance and using the same knife. The acts form one transaction and were part of the same offense. No *sua sponte* instruction was necessary.

The conviction of count one, attempted murder with a knife causing great bodily injury (§§ 664/187, 12022, subd. (b), 12022.7) is reversed; in all other respects, the judgment is affirmed.

Staniforth, Acting P. J., and Work, J., concurred.