Filed 11/13/13  P. v. Bankhead CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>    **Plaintiff and Respondent,**<br><br>        **v.**<br><br>**JOE HENRY BANKHEAD,**<br><br>    **Defendant and Appellant.** | **A135040**<br><br>(Solano County<br>Super. Ct. No. VCR206045) |

Defendant Joe Henry Bankhead appeals following his conviction by a jury of voluntary manslaughter (Pen. Code, § 192, subd. (a)),[1] as a lesser included offense of second degree murder.  Appellant contends the trial court committed errors relating to the lesser included offense, jury selection, and admission at trial of his statement to the police.  We affirm.

## PROCEDURAL BACKGROUND

An information charged appellant with second degree murder (§ 187, subd. (a)) and alleged two prior strike convictions (§§ 1170.12, subds. (a)-(d); 667, subds. (b)-(i)) and a prior prison term (§ 667.5, subd. (b)).  In September 2011, a jury acquitted appellant of murder, found him guilty of voluntary manslaughter, and found true one of the prior strike allegations and the prior prison term allegation.

---

[1]    All undesignated section references are to the Penal Code.

1

In March 2012, the trial court sentenced appellant to the upper term of 11 years, doubled due to the prior strike and with an additional consecutive year for the prior prison term, for a total prison term of 23 years. This appeal followed.

FACTUAL BACKGROUND

*Prosecution Case*

Thelma Washington lived in an apartment in Vallejo in a house that had been divided into two apartments; the victim, Adrian Williams, lived in the second apartment. Washington's caregiver, Lawrence Newson, was in her apartment every day. Williams was thin and frail; he walked with a cane and one side of his body seemed paralyzed.

Appellant and Williams were friends. Washington and Newson last saw Williams alive in appellant's company, sometime during the day on December 31, 2009. Early the morning of January 1, 2010, appellant knocked on Washington's window or door. Newson responded, and appellant asked Newson if he had seen Williams. Appellant returned asking about Williams the next day; he said he had knocked on Williams's door but no one had answered. Appellant returned again the following morning, January 3; appellant said he and Williams had been drinking on New Year's Eve and got into an argument. He also said he was concerned because Williams was sickly and had not been feeling well. The same day, appellant called Lillie Hurd, who owned the building where Williams and Washington lived. Appellant told Hurd that he had beaten up Williams during a fight on New Year's Eve.

On January 5, 2010, on Hurd's suggestion, appellant called 911 for assistance. Vallejo Police Officer Munoz arrived at Williams's home at 5:00 p.m. on January 5, in response to a call for a welfare check. Munoz was told the caller was concerned because he had not seen a friend for a few days; appellant met Munoz in front of the residence. Appellant told Munoz that Williams suffered from seizures, but he did not say anything about a fight. After Munoz received no response at the door, he called the fire department to force entry into Williams's apartment.

Once inside, Munoz saw Williams on the floor with blood and other fluid coming from his mouth. Williams was breathing and had a pulse, but he was not conscious.

2

According to a forensic pathologist, Williams was admitted to a hospital in a "vegetative state." He had many broken facial bones and a large subdural hematoma. Williams died in March 2010 and it was determined that the cause of death was "blunt force trauma to the head, with complications." The forensic pathologist testified there were at least four impacts on Williams's face, it took a lot of force to break Williams's cheekbone, and Williams's injuries were not due to falling from a standing position.

An expert in blood spatter pattern interpretation testified that, based on observations of separate spatter areas, Williams was struck by at least three or four blows. There were small blood spatters, which indicated the use of considerable amount of force.

On January 8, 2010, former Vallejo Police Detective Mark Bassett interviewed appellant about Williams. A recording of the interview was played for the jury. Appellant said he had known Williams since childhood. He arrived at Williams's house on the afternoon of December 31, 2009, and appellant and Williams spent the afternoon and evening together. Both were drinking, and they also shared some crack cocaine, which appellant said made him paranoid. He and Williams fought. Appellant wanted to leave, but Williams would not let him. Appellant explained, "I was leaving and he grabbed me and . . . I punched him." He also stated, "I kind of snapped him and . . . then when he was going down I snapped him again." He admitted hitting Williams two or three times. He denied hitting Williams very hard or hitting him in the eye or the cheek.

*Defense Case*

A forensic pathologist testified for the defense that she could not tell from looking at Williams's "CT" scans whether his injuries were caused by punches, a fall, or another mechanism. She believed most of the facial fractures Williams sustained involved thin bones that were easily broken, and the cheekbone fracture could have been caused by falling onto a hard object. She believed Williams was struck at least two times.

An expert in blood spatter analysis testified for the defense that certain spatters were of "fairly low velocity." He did not disagree that the spatter pattern showed at least three or four blows were struck.

3

DISCUSSION

I. *Voluntary Manslaughter as a Lesser Included Offense*

Over the prosecutor's objection, appellant asked for and received jury instructions on lesser included offenses, including involuntary manslaughter and voluntary manslaughter under both heat of passion and imperfect self-defense theories. The Supreme Court has explained the relationship between murder and voluntary manslaughter as follows: " ' "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills [nonetheless] lacks malice . . . when [he] acts in a 'sudden quarrel or heat of passion' (§ 192, subd. (a)), or . . . kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.]' [Citations.] [¶] These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating the element of malice* that otherwise inheres in such a homicide [citation].' [Citation.]" (*People v. Rios* (2000) 23 Cal.4th 450, 460-461 (*Rios*).)

Appellant contends the trial court erred in instructing the jury on voluntary manslaughter because there was no substantial evidence (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643) supporting a finding of provocation under the heat of passion theory or belief in an imminent threat under the imperfect self-defense theory. The contention is forfeited because appellant's counsel requested that the trial court give the voluntary manslaughter instructions. (*People v. Wader* (1993) 5 Cal.4th 610, 658 [when defense counsel makes a "conscious and deliberate tactical choice to request a particular instruction" the invited error doctrine bars an argument on appeal that the giving of the instruction was error]; see also *People v. Lee* (2011) 51 Cal.4th 620, 645.)

We reject appellant's argument that counsel's request for the instructions was not a deliberate tactical choice. Counsel's request was express and unambiguous, it was made in the face of the prosecutor's argument that there was no evidentiary basis for the

4

instructions, and there is no indication the request was the result of ignorance or mistake. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.) It appears counsel believed it was tactically advantageous for the jury to have an alternative between murder and involuntary manslaughter, even if the evidence supporting a conviction for voluntary manslaughter rather than murder was weak.[2]

Appellant also argues the invited error doctrine does not apply to requests *for* instructions on lesser included offenses, as opposed to requests that an instruction on a lesser *not* be given, but he cites no authority supporting that proposition. The invited error doctrine was applied in directly analogous circumstances in *People v. Barnard* (1982) 138 Cal.App.3d 400, 409, which concluded, "since the defendant's trial counsel requested the instruction on the lesser included offense of possession, the doctrine of invited error applies, and [the] defendant will not be heard to complain that the instruction he requested was in fact given by the judge and acted upon by the jury." (See also *People v. Kozel* (1982) 133 Cal.App.3d 507, 527; *People v. Williams* (1980) 102 Cal.App.3d 1018, 1025.)

We conclude that the invited error doctrine precludes appellant from arguing on appeal that the trial court erred in giving the voluntary manslaughter instructions.[3]

II. *Denial of Motion for New Trial*

Appellant contends the trial court erred in denying his motion for new trial seeking reduction of his conviction from voluntary to involuntary manslaughter. He argues there

---

[2] The jury was instructed that involuntary manslaughter applies "[w]hen a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life." In light of the overwhelming evidence that appellant delivered multiple forceful facial blows to Williams, who was very frail, defense counsel may have believed it was unlikely the jury would convict appellant of only involuntary manslaughter.

[3] To the extent appellant contends his conviction for voluntary manslaughter is not supported by substantial evidence because there is no evidence of provocation or belief in an imminent threat, the claim fails because those are not elements the prosecution was required to prove to support the voluntary manslaughter conviction. (*Rios*, *supra*, 23 Cal.4th at p. 462.)

was insufficient evidence he demonstrated conscious disregard for life, and, therefore, the most he could be convicted for was involuntary manslaughter.

As explained in *People v. Butler* (2010) 187 Cal.App.4th 998, 1006, "Involuntary manslaughter is a lesser offense of murder, distinguished by its mens rea. [Citation.] The mens rea for murder is specific intent to kill or conscious disregard for life. [Citation.] Absent these states of mind, the defendant may incur homicide culpability for involuntary manslaughter. [Citations.]" (See also *Rios*, *supra*, 23 Cal.4th at p. 460.) Appellant argues insufficient evidence existed to support a finding of conscious disregard for life because he only used his fists in attacking Williams and because the defense forensic pathologist testified Williams's injuries were not necessarily the product of great force.[4]

In denying the motion for new trial, the trial court focused on Williams's known frailty, the number of blows, and the fact that one of the blows was delivered after Williams was already on the ground. A finding of conscious disregard for life is also supported by the testimony of the prosecution's forensic pathologist that Williams's injuries reflected the use of a great deal of force. (Cf. *People v. Spring* (1984) 153 Cal.App.3d 1199, 1206 [the defendant's "assault consisted of but a single punch and was not even of sufficient force to knock down an elderly man or cause more than slight outward damage"].) Appellant has not shown the trial court abused its discretion in denying his motion for a new trial. (*People v. Homick* (2012) 55 Cal.4th 816, 894.) To the extent appellant argues a finding of conscious disregard for life is not supported by substantial evidence (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237), we reject that contention as well.

III. *Appellant's* Batson/Wheeler *Claim*

Exercising peremptory challenges on the basis of race violates the guarantee of equal protection of the laws under the Fourteenth Amendment to the United States

---

**4** Appellant asserts the jury found there was no implied malice when it acquitted appellant of second degree murder. He is incorrect. The jury's finding he was guilty of voluntary manslaughter demonstrates the jury found the killing would have been murder, but the malice was *negated* by circumstances amounting to provocation or imperfect self-defense. (CALCRIM Nos. 570 & 571; *Rios*, *supra*, 23 Cal.4th at pp. 460-461.)

Constitution (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*)) and the right under the California Constitution to be tried by a jury drawn from a representative cross-section of the community (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*)). (*People v. Huggins* (2006) 38 Cal.4th 175, 226 (*Huggins*).) Appellant contends the prosecutor below exercised peremptory challenges on the basis of race and the trial court erred in rejecting appellant's objections thereto.

Batson requires a three-step analysis in response to a defendant's claim that a prosecutor's peremptory challenges are race based:

" 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' [Citation.]" [Citation.] Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal. [Citation.] And although a party may exercise a peremptory challenge for any permissible reason or no reason at all [citations], 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination' [citation].

"In evaluating a trial court's *Batson–Wheeler* ruling that a party has offered a race-neutral basis for subjecting particular prospective jurors to peremptory challenge, we are mindful that ' "[i]f the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' [Citations.] In a case in which deference is due, '[t]he trial court's ruling on this issue is reviewed for substantial evidence.' [Citation.]" (*Huggins*, *supra*, 38 Cal.4th at pp. 226-227.)

On appeal, appellant objects to peremptory challenges to two prospective jurors, both of whom are African-American. First, Prospective Juror B.C. (B.C.) worked as a

pharmacy technician at a state correctional institution. During questioning by the prosecutor about her work, B.C. stated, "when I see the inmates, I know that they've already been to trial, so I don't think that with what's happening here now — we're looking at what happened in his life before and determining if what happened is his fault, and that's all I can take from it." In answer to a follow-up question from the prosecutor, B.C. discussed a friend who was murdered by her husband, stating, "it sort of makes you wonder what could have happened in their life that would have caused him to get to the point where he would kill his wife, but I think I can put that aside, because that's something that happened in the past, and be fair to — to the guy here." In explaining her decision to use a peremptory challenge on B.C., the prosecutor stated "my primary concern with her was she was struggling with what happened in people's backgrounds to make them behave the way that they're behaving. She mentioned that on more than one occasion in relation to people who perpetrate crimes . . . ." The prosecutor continued, "I found that to be troublesome, because as a juror, I want a person who is going to be looking at these discrete facts, what comes from the evidence, and not thinking about what happened in somebody's background to make them behave this way."

The trial court denied the *Batson/Wheeler* claim as to B.C., reasoning, "I do find there would be a prima facie case, but I do accept the prosecutor's reasons as to [B.C.]. There are some reasons based on the record, based on the questioning of [B.C.], that would support a race neutral peremptory against her. That being what [B.C.] said regarding a comment about the background. That would be a race neutral reason. I accept that explanation as to [B.C.]." We conclude B.C.'s comments quoted above constitute substantial evidence supporting the trial court's finding that appellant did not prove purposeful racial discrimination in the peremptory challenge to B.C.

The second peremptory challenge at issue was as to Prospective Juror J.M. (J.M.). His questionnaire indicated he had completed 12th grade, but provided no information concerning a "degree" or "present employment." The prosecutor explained her decision to challenge J.M. as follows: "My biggest concern with [J.M.] was his immaturity. Not only was he physically bopping around and moving his head, distracted is what he

8

appeared to me. He had his headphones in his pocket, and every time he left that box, he immediately stuck his headphones in his ears. [¶] My concern here is that he is not necessarily paying attention to the proceedings. He's isolating himself from everyone else. Given that, in combination with his response to my question of 'Are you able and willing to do this?' his response was, 'I know how to play the game. I can follow the rules of the game' — that was concerning to me.[5] That tells me he's not taking this seriously. This is not a game. [¶] In addition, his questionnaire . . . is completely devoid of any information. He has no high school degree. He has no children. He has no job. He has no life experience. I think it is important to note he is by far the youngest person on this jury. And given that he has no life experience whatsoever, and his lack of seriousness and his lack of maturity, I have great concerns about his ability to sit as a juror."

The trial court denied the *Batson/Wheeler* claim as to J.M., reasoning, "I am somewhat concerned as to [J.M.], although in terms of the explanation, I am going to find it to be credible. There is this basis that [the prosecutor] has described, although it is based on the subjective factors which are certainly more difficult to gauge. The nature of peremptory strikes — at this point I don't find it to be based on race. I will — I accept the prosecutor's representation as to the reasons." On appeal, appellant argues, as he did below, that other jurors also put down 12th grade as their highest education level completed. However, the prosecutor also stated her peremptory challenge was based on J.M.'s perceived immaturity and distractedness; the subjective nature of those assessments does not render them improper bases for a peremptory challenge. (*People v. Mai* (2013) 57 Cal.4th 986, 1053, as modified Oct. 3, 2013 (*Mai*) ["the prosecutor's demeanor observations, even if not explicitly confirmed by the record, are a permissible race-neutral ground for peremptory excusal, especially when they were not disputed in the trial court"]; see also *People v. Lenix* (2008) 44 Cal.4th 602, 622 ["[m]yriad subtle nuances" shape an assessment of a prospective juror's answers during voir dire

---

5 J.M. stated: "We're under the roof of this building, and there are rules. And, hey, I mean, if you agree to play a game, you agree to play by those rules. Rules are rules."

"including attitude, attention, interest, body language, facial expression and eye contact"].) Moreover, the prosecutor emphasized J.M.'s comments analogizing the trial process to a game. Even if his comment can be interpreted in different ways, the prosecutor's assertion that the comment gave her concern was not " 'implausible or fantastic.' " (*Huggins*, *supra*, 38 Cal.4th at p. 227; see also *Mai*, at p. 1051 ["the prosecutor was not obliged to accept" defendant's proffered interpretation of a juror's "ambiguous remarks"].) We conclude substantial evidence supports the trial court's conclusion that appellant did not prove purposeful racial discrimination in the peremptory challenge to J.M.

The trial court did not err in denying appellant's *Batson/Wheeler* claim.[6]

IV. *Admission of Appellant's Statement to the Police*

Appellant contends the statement he gave to Bassett at the police station was given while he was in custody and should have been excluded because he was not advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*), prior to questioning.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation. [Citation.] All the circumstances of the interrogation are relevant to this inquiry, including the location, length and form of the interrogation, the degree to which the investigation was focused

---

[6] Appellant contends the trial court erred in failing to conduct a thorough comparative juror analysis. However, he makes no showing that any other jurors made comments or exhibited behaviors similar to those mentioned by the prosecutor in explaining her peremptory challenges to B.C. and J.M. (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 241 ["If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."].)

10

on the defendant, and whether any indicia of arrest were present." (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).) "The test for custody does not depend on the subjective view of the interrogating officer or the person being questioned. [Citation.] The only relevant inquiry is ' "how a reasonable man in the suspect's shoes would have understood his situation." ' [Citation.]" (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088-1089.) This determination is based on the totality of the circumstances; "no one factor is controlling." (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster*); see also *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 ["we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest"].) On appeal, "[w]e apply a deferential substantial evidence standard to the trial court's factual findings, but independently determine whether the interrogation was custodial. [Citation.]" (*Pilster*, at p. 1403; see also *Moore*, at p. 395.)

In the present case, Bassett testified at a pretrial evidentiary hearing on the *Miranda* issue that, on January 7 or 8, 2010, he left a voicemail message for appellant asking to speak about Williams. Bassett also testified he told appellant that he "needed to" speak to him. Appellant agreed to come to the police station and suggested a 1:30 p.m. meeting time. Bassett greeted appellant in the lobby, and they walked to an interview room in a secured area of the police station. Bassett asked appellant if he had any weapons and then, with appellant's consent, searched him for weapons. Bassett confirmed appellant was there "voluntarily" and told appellant, "you're free to leave at any time, you're not under arrest or anything like that. I just had some questions for you about what, what went on with [Williams]. So, just understand if you have, if you don't want to talk anymore, just let me know. We'll stop the interview and I'll walk you out and you can leave." Appellant said he understood. Nevertheless, Bassett had already decided he would be arresting appellant after the interview. The interview lasted about

11

an hour.[7]  At some point Bassett asked appellant if he had any injuries to his hands. Appellant responded affirmatively, showed his hands to Bassett, and asked if he was required to allow Bassett to photograph his hands.  Bassett responded that he was.  After the interview, appellant asked if he was free to leave and Bassett told appellant he was under arrest.

The trial court concluded appellant was not in custody at the outset of the interview because he went voluntarily to the police station and spoke with Bassett.  The interview became custodial more than halfway through, when Bassett told appellant he was required to allow Bassett to photograph his hands, and the subsequent portions of the interview were inadmissible.  Nevertheless, the entirety of the interview was played for the jury because Bassett was cross-examined at trial regarding comments in the excluded portion of the interview.

On appeal, appellant argues he was in custody during most or all of the questioning.  Appellant emphasizes that contact was initiated by Bassett, the questioning took place in a secured area of the police station, Bassett searched appellant for weapons, Bassett's questions made it clear appellant was being questioned as a suspect, and appellant was arrested after the interview.[8]

The present case is analogous to the California Supreme Court's decision in *Moore*, *supra*, 51 Cal.4th 386.  There, a police officer asked the defendant, who was the last person to see the victim alive, to come give a statement at the police station.  (*Id.* at p. 396.)  Once in the interview room at the station, a police investigator told the defendant

---

**7**    Bassett testified the interview lasted "Thirty to 45 minutes . . . .  Maybe a little longer," but the trial court stated the interview lasted "roughly about an hour" based on the court's calculations.

**8**    Appellant asserts the door to the interview room was locked and his driver's license was taken away from him, but the cited portions of the record do not support those assertions.  At oral argument, appellant's counsel referred to the video of the interrogation as support for the assertion that Bassett held on to his driver's license, but appellant failed to designate a copy of the video recording for transmittal to this court. (See Cal. Rules of Court, rules 8.224, 8.320(e).)  In any event, that circumstance would not change our determination based on the totality of the circumstances.

12

he was not under arrest and was free to leave. (*Id.* at p. 402.) The defendant was not restrained, and he was interviewed for one hour and 45 minutes. (*Ibid.*) The questioning initially focused on filling in the details of the defendant's story as a witness rather than as a suspect; but, "[a]fter a while . . . , the detectives interjected some more accusatory and skeptical questions." (*Ibid.*) The investigators asked the defendant whether he burglarized the victim's house; they urged the defendant to be honest; and they asked various questions about the defendant's prior arrests and other matters that "conveyed their suspicion of [the] defendant's possible involvement." (*Ibid.*) The police ultimately declined the defendant's request to be taken home and read the defendant the *Miranda* advisements. (*Moore*, at pp. 401-402.)

The Supreme Court concluded the defendant in *Moore* was not in custody during the bulk of the interview, reasoning, "At least until [the] defendant first asked to be taken home and his request was not granted, a reasonable person in [the] defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Moore*, *supra*, 51 Cal.4th at p. 403.) The court emphasized that the defendant had gone to the station voluntarily and was expressly told he was free to leave. (*Id.* at p. 402.) The court pointed out, "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.]" (*Moore*, at p. 402, italics omitted.) Regarding the accusatory questioning, the court noted that the interview as a whole was not "particularly intense or confrontational" and stated that "police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Ibid.*)

The present case is not materially distinguishable from *Moore*. There is no basis to conclude the atmosphere in the interview room in the present case was more coercive than the interview room in *Moore*. In *Moore*, there were two investigators involved in the questioning, while in the present case only Bassett was present, and the interview in *Moore* lasted significantly longer than the interview in the present case. Appellant was

13

searched for weapons, which apparently did not occur in *Moore*, but that security precaution would not have conveyed to a reasonable person that they were not free to leave. Portions of the interview were clearly accusatory: For example, Bassett probed appellant's failure to call the police more promptly, asked pointed questions about appellant's fight with Williams , and urged appellant to admit he punched Williams more than once. Nevertheless, as the trial court found, Bassett did not use intimidating or threatening tactics in questioning appellant. The questioning in the present case was not significantly more intense or confrontational than that in *Moore*, where the investigators accused the defendant of burglarizing the victim's home and stabbing her with a knife. (See *Moore*, *supra*, 51 Cal.4th at pp. 398-400.) Finally, although appellant heavily relies on the fact he was arrested after the interview, in *Moore* the defendant also was formally detained at the end of the interview (*id.* at pp. 401-402).

Appellant has failed to distinguish this case from *Moore* or direct us to more analogous authority. We follow *Moore* in concluding the trial did not err in concluding appellant was not in custody prior to the point at which Bassett required appellant to allow his hands to be photographed. The trial court did not err in admitting that portion of the interview at trial, and appellant does not contend the court erred in admitting the remainder of the interview following the cross-examination of Bassett.[9]

## DISPOSITION

The trial court's judgment is affirmed.

---

[9]   Appellant also contends the trial court erred in denying his request to redact certain questions posed by Bassett and in permitting the prosecutor to include certain excerpts from the interview in her closing argument. The trial court instructed the jury, "During the trial, you heard the taped interview of the police interrogation of [appellant]. The officer's statements cannot be considered as evidence by themselves. You may, however, consider the officer's statements to understand [appellant's] answers. Just because the officer makes a statement to [appellant] does not necessarily make the statement true." We assume the jury followed this instruction. (*People v. Wilson* (2008) 44 Cal.4th 758, 798.) Appellant has not shown the trial court erred or the prosecutor committed misconduct.

_____
SIMONS, Acting P.J.

We concur.


_____
NEEDHAM, J.


_____
BRUINIERS, J.