Filed 3/4/15  P. v. Donias CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARC ANTHONY DONIAS,<br><br>Defendant and Appellant. | C072307<br><br>(Super. Ct. No. 09F06779) |

Defendant Marc Anthony Donias appeals from a judgment of conviction following a jury trial.  Defendant severely injured his girlfriend, Felicia Huppert, in a violent altercation.  He was charged with attempted murder (Pen. Code, §§ 664, 187 (Count One)),[1] assault with a deadly weapon (§ 245, subd. (a)(1) (Count Two)), battery resulting in the infliction of serious bodily injury (§ 243, subd. (d) (Count Three)), infliction of corporal injury on a former cohabitant (§ 273.5, subd. (a) (Count Four)), and criminal

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

threats (§ 422 (Count Five)). As to all counts, it was alleged that defendant inflicted great bodily injury (GBI) under circumstances involving domestic violence (§ 12022.7, subd. (e)) and as to Counts Three and Four, it was alleged that he used a deadly weapon (§ 12022, subd. (b)(1)). Subsequently, a jury found defendant guilty on all counts except making criminal threats and found the allegations true. Defendant then filed a motion for a new trial based on ineffective assistance of counsel. The trial court denied his motion.

On appeal, defendant contends that: (1) a hallway conversation between a juror and a testifying officer resulted in juror bias; (2) the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of attempted voluntary manslaughter based on the heat of passion; (3) his trial counsel was ineffective because he failed to request CALCRIM No. 3426 on voluntary intoxication; and (4) the court erred in denying his motion for a new trial based on ineffective assistance of counsel.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Trial Evidence

### The Prosecution's Case-in-Chief

Huppert testified that she first met defendant while on vacation in Hawaii in 1989, where she saw him perform in a strip show. The two had sex that night and remained in contact after she returned to Sacramento. Huppert returned to Hawaii and lived with defendant for a month before she began college. Defendant then moved to California to work as a model, and he and Huppert continued to date for approximately one year. Huppert testified that she ended the relationship when she discovered that defendant had given her a venereal disease and was working in the pornography industry.

Huppert did not see defendant for nearly 20 years, and on July 4, 2008, she decided to look him up on the Internet and found he was working on Broadway in New York. She emailed defendant's entertainment attorney and after talking to defendant, she went to stay with him at his home in New Hampshire for several days. She testified that

2

defendant decided to move to Sacramento to renew their relationship and attend culinary school. Defendant eventually purchased a condominium, and in May 2009, Huppert moved in with him but continued to keep some of her things at the guest quarters behind her brother's home, where she had been living. She explained that the guest house was accessible through a gated pathway leading to the area behind the main house. Huppert testified that about two weeks after they moved into a condominium together, defendant told her that his friend, Leo Uy, was also relocating to Sacramento and would stay with them for a while until he found employment and his own place to live. She testified that defendant told her that Uy was just a friend, and initially, she did not mind that defendant invited him to live with them. She further testified that she and Uy "got along famously" because they worked in the same industry and had a "connection." However, she testified that there was some tension that she did not understand at first and "a little competitiveness" with Uy. She testified that at some point, Uy told her, "Anthony will never love you like he loves me. You will never make the money that I make." She explained that she thought it was an odd comment but did not realize that defendant was romantically involved with Uy at first.[2]

Huppert also testified that about a month after Uy moved in with them, defendant and Uy registered as domestic partners but defendant claimed they did so in order to get Uy on defendant's insurance plan. She testified that on the way home from the notary, she asked additional questions and discovered that defendant and Uy had been in a civil

---

[2] Huppert testified that while she did not know that defendant was bisexual, she found out after he gave her a venereal disease that he appeared in gay pornographic movies in 1990. However, she testified that defendant told her that he was heterosexual and only performed sexual acts with other men on film for money. On cross-examination, defense counsel questioned Huppert about an August 29, 2009, email defendant sent her in which he told her he loved her but needed to have sex with other men. Huppert denied receiving the email and said that defendant set up her email account but she did not check it because she did not do anything on computers.

union in New Hampshire for seven years. She was "stunned" upon learning that defendant and Uy were "married." She testified that she and defendant began having problems in their sex life after Uy moved in with them, and defendant purchased a sex swing to try to rekindle their relationship. She testified that she had a sexual encounter with both defendant and Uy on one occasion. She admitted to not being truthful about having a sexual encounter with Uy at the preliminary hearing because her father was present. However, she insisted that she and Uy never touched each other during the encounter and, consequently, she did not consider it a sexual act between herself and Uy.

A few days prior to the alleged assault, she found defendant and Uy engaged in a sexual act. She testified that she was upset and tried to move out right away but defendant would not let her take her personal property with her, so she left it there and moved back into her brother's guest house. The guest house was approximately 250 square feet, with a bedroom and a small bathroom.

She did not see defendant after she moved out until he came to her home on September 5, 2009. She also said she did not talk to him but he called her 99 times on September 5.

Later in her testimony, defense counsel questioned her regarding some September 4, 2009, text messages between defendant and Huppert about using the sex swing together. Huppert testified that she did not recall the text messages and said she was done with defendant at that point and "had no intention of doing anything with him."

On September 5, 2009, while Huppert was taking a bath defendant showed up unexpectedly at the guest house. Huppert let him in the house and returned to her bath. She invited defendant into the bathroom with her to talk, and he sat on the toilet seat next to the bathtub. Defendant became agitated and she noticed that defendant's breath smelled of alcohol, describing his level of intoxication as a 10 on a scale from 1 to 10. She added, "he was wasted. He was drunk. He was really drunk." She grew uncomfortable when he accused her of infidelity and became "mean." She testified that

4

defendant asked if she was going out that night or having someone over and she testified that she did not: "I had no plans, no nothing." She then got out of the bathtub and told defendant to go lay down because he was drunk. Huppert called Uy and asked him to come pick defendant up because she was concerned that defendant was too drunk to drive, but Uy refused to come. Defendant began breaking things, and she called Uy again asking for help, which he agreed to do. Huppert asked defendant why he was there, and he replied, "I came over here to kill you like your father said."

Huppert testified that defendant, who was approximately twice Huppert's weight, then grabbed her and threw her into the bathroom.[3] She skidded across the toilet to a corner where she became lodged between the toilet and a shelf, knocking off the toilet seat in the process.[4] She testified that defendant then followed her into the bathroom and struck her head, including her ears and face "about 60 times." Defendant then raised the ceramic toilet tank lid over his head and slammed it down on her head, which caused her to black out. Huppert testified that before defendant hit her, she held her head down so she would not be hit in the face. The lid shattered and some of the shards cut her leg and breast. She explained that when she awoke, she saw blood everywhere and her adrenaline was high, so she kicked defendant and caused him to fall backward into the bathtub. While defendant was in the bathtub, she pulled herself up and ran towards the door. She struggled with the door because the top lock, which she never used, was locked and she surmised defendant had locked it when he came inside. She was able to exit, and she then ran to a neighbor's house to get help.

---

[3] Huppert said she was five feet one inch and weighed 109 pounds. Defendant was six feet one or two inches and weighed approximately 230 pounds. Defendant testified he is six feet tall and 198 pounds.

[4] Huppert testified that her bathroom was very small and that it would be difficult for two people to stand in the bathroom between the toilet and the bathtub.

Huppert's neighbor, Shari Nichelini, testified that on the night of the altercation, she had her front door cracked open so that her cats could come in and out. Suddenly, she heard someone running up her staircase and yelling for help, and she then found Huppert in her home, naked and wet with blood all over her, and observed a "big gash in her head." Huppert was sobbing hysterically and told Nichelini that "her boyfriend hit her over the head with the toilet" and that he was going to kill her. Nichelini called 911 and gave Huppert a towel and a bathrobe.

Officer John Morris testified that he responded to the 911 call and made contact with Huppert at Nichelini's house. He saw blood covering Huppert's head and neck and a large cut on the top of her head. He also observed that she had a large bruise on her upper back and swelling, discoloration, and abrasions on her face. Officer Morris did not take a formal statement at that time but asked her generally what happened, and Huppert, crying and distraught, told him that defendant attacked her. Officer Morris observed blood drops leading from the guest home where Huppert lived to Nichelini's house. He and other officers searched Huppert's home for defendant but could not find him.

Later, Officer Morris obtained additional details from Huppert. She informed him that she and defendant had broken up three days prior and were not living together. Huppert also told him that the previous night, September 4, she went to defendant's house and during an argument, defendant choked her, but she did not report it. She also said defendant told her that "if he couldn't have me, then no one could." Hubert said defendant "was beating her like she was a man."

Another police officer, Ryan Buchanan, testified that he recovered shattered and bloody pieces of the toilet tank lid in Huppert's bathroom.

Huppert was taken to the emergency room at UC Davis Medical Center. The treating physician, Dr. John Richards, testified that he observed a deep laceration on Huppert's scalp, which required staples, and he observed bruising on Huppert's face, back, hand, and arm. Huppert was also diagnosed with a concussion. Huppert's injuries

were consistent with her version of events, including being struck by a ceramic toilet tank lid by a man who raised it above his head before bringing it down onto her head. Dr. Richards, who had been an emergency room physician at UC Davis Medical Center for 19 years and treated head trauma on almost every shift, said that it was not unusual to see patients who had been struck as Huppert described only sustain a laceration and no fracture. However, on cross-examination, after being shown photographs of the bathtub, Dr. Richards testified that the laceration was also "consistent with hitting one's head either on the side [or] the back of the tub or on the wall of the tub or some other object within the tub."

Defendant was also treated for injuries that night. Dr. Anthony Occhipinti treated defendant at Kaiser North hospital. Defendant had a U-shaped laceration on his left hand, lacerations on the front and back of a fractured right-hand finger, bruising on his left forearm with a splinter protruding through the skin, and a laceration on the right side of his forehead. Dr. Occhipinti smelled alcohol on defendant's breath.[5] He testified that defendant's hand injuries would be consistent with a ceramic toilet tank lid shattering in his hands. Additionally, he testified that the fractured finger could have been caused by defendant smashing the lid down on Huppert and getting his finger caught between the lid and the toilet tank. However, he also testified that defendant's U-shaped hand laceration injuries would be consistent with being cut with a knife. Additionally, he testified that defendant's injuries would be consistent with using the lid to defend himself and then slipping and falling, with the lid breaking in his hands.

### Defense Evidence

The defense's theory of the case was that defendant held up the toilet tank lid in self-defense, and he and Huppert both fell into the bathtub while she was attacking him,

---

[5] There is no evidence of blood-alcohol testing.

causing the toilet tank lid to shatter and resulting in their injuries.  Defendant testified on his own behalf.

Defendant testified that he is bisexual and that he was candid about his sexuality with Huppert when they first met in 1989.  He explained that Huppert later broke up with him when she found out that he performed in gay pornographic films.  When he and Huppert reconnected in 2008, he had been in a domestic partnership with Uy for six years.  He explained that he and Uy had an agreement that he could date other women as long as he did not date other men.  He testified that when Huppert contacted him in 2008, he was excited to rekindle their relationship.  He claimed that Huppert knew about Uy, and the three agreed that defendant would move to California to attend culinary school and Uy would eventually join them.

Defendant testified that when Uy first moved to California, both men and Huppert were on good terms and candidly discussed the boundaries in their relationships.  However, as time went on, Uy and Huppert grew jealous of one another.  He testified that on September 3, 2009, Huppert moved out because she was extremely upset that defendant and Uy used the sex swing.  She returned to the condominium the following day, and they had another argument.

Defendant admitted that on September 5, he called and texted Huppert repeatedly throughout the day.  He grew concerned when she did not answer.  He said she was at work cutting hair when he was calling her during the day, but she usually returned his calls.  He was concerned about whether she was "okay emotionally" and he was also sorry about breaking his promise concerning the sex swing.  He said he was not "upset" when he went to see Huppert.

During cross-examination, he testified that it was not until that night that he thought she might be cheating on him.  He testified that if he found out that Huppert was with another man, he would be "[d]isappointed."  He said "at some point that night that crossed [his] mind."  When asked how long it took for that concern to develop, defendant

8

replied, "I don't even really think I ever got to the point where is she cheating on me or that, because that's not the arrangement we have. It's not like -- you know, what I did during the day was -- so I wouldn't get there to that. [¶] I would -- I would -- I watched the -- the porn tape that we had made, and I watched that throughout the day. And -- and that showed me that she doesn't need that male sex from anyone else because our sex was so great. So if anything, I was curious about if she was going to be with a woman, who is this woman. She knows [Uy], why can't I know who the woman is." He assumed that if Huppert were going to cheat on him, it would be with a woman because that was their "understanding." However, he testified that the possibility of Huppert cheating was not his primary concern: "it was always a thought that I had, but it wasn't in the forefront of my mind."

Defendant further testified that when he arrived at Huppert's home, he observed that both of her cars were there and on that basis, he assumed that she was home. He testified that he was concerned because she had not returned his calls and because she used "a lot of drugs." Defendant testified that after seeing a man wearing a hoodie walking near Huppert's home, he thought she might be having sex with her drug dealer. When asked if that would make him angry, defendant responded, "That would perturb me, but I don't think it would bring me to anger." When asked whether he called Huppert incessantly because he was jealous that she might be with another man, defendant responded, "I could have any woman I want, sir."

He then went to Huppert's home, came inside and sat on the toilet while Huppert returned to her bath and "started out by . . . apologizing" about breaking his promise concerning the swing. When asked whether Huppert's taking a bath confirmed his suspicions that she was cheating, defendant replied that it did not. Defendant testified that instead, he was "relieved" to find that Huppert was alright and that there was no one else there. Huppert's demeanor at that point, according to defendant, was sexy. He then asked, "Why can't we work this out[?]" She asked defendant what it was she could not

give him that Uy could. When he explained he loved both of them and pointed out she had previously agreed to the arrangement, Huppert began to get a "little erratic" and slammed her arms down in the tub causing a splash. She said, "fine" and then got out of the tub and left the bathroom. He did not follow her, but heard her on the phone talking to Uy. She then returned to the tub. There was an awkward silence. He told her he was going to urinate and leave. According to defendant, Huppert's demeanor was like that of a spoiled brat, arms folded and moping or pouting.

He testified that he was urinating in the toilet next to the bathtub and was just about to leave when Huppert asked him why he didn't love her the way he loved Uy. He responded, "why don't you get a boob job." Defendant testified that Huppert then became "enraged" and came after him. He testified that he felt a "stinging sensation" on his left hand and saw "a glint or flash of something." He testified he ripped off the toilet seat to use it as a shield, but he dropped it when she pushed him. He testified that he then picked up the toilet tank lid to use it as a shield. He said he pushed Huppert into some shelves and that she came at him a couple of times before he slipped and they both fell into the bathtub, which caused the tank lid to shatter.

Defendant testified that after he and Huppert fell into the bathtub, she screamed, "Get out of my house, you fucker," and he went home. Before he left, he claimed he saw no injuries on Huppert and did not see that she was bleeding. He denied ever telling Huppert that he was going to kill her.

After he arrived home, he realized Uy was not there and that he likely needed medical attention, so he went to the hospital. Defendant claimed that he did not report the incident to the police because he did not want to get Huppert in trouble. At the hospital, he told medical staff, " 'My cheating girlfriend came at me with a shiny object. I don't know what it was.' " When he talked to the police at the hospital, he said he did not mention the toilet tank lid because he wanted to protect Huppert.

10

Defendant claimed that because he consumed whiskey and Vicodin when he returned home before going to the hospital, he was not thinking clearly during the police interview. However, he said he was not intoxicated before he went to Huppert's home and had only consumed one shot of whiskey over the course of two and a half hours before arriving at Huppert's home.

**Prosecution's Rebuttal Case**

Officer Christopher Swift testified that after first responding to the scene at Huppert's home, he later responded to a report of domestic violence at the Kaiser hospital and made contact with defendant. He observed defendant's hand injuries and a scratch above defendant's eye.

Defendant told Officer Swift that he and Huppert had been together for approximately 15 months. Huppert had not responded to his repeated calls earlier that day, so he went to her house because he suspected her of cheating on him. Defendant never said he went to Huppert's house to check on her well-being. Nor did he say he went there to mend their relationship. Defendant said that when he arrived, he sat in his car and saw a man leaving Huppert's house. He suspected this is the man with whom Huppert had been "cheating." Defendant said he felt this suspicion was because Huppert was taking a bath, which was her habit after having sex. Defendant said when he asked Huppert what was going on, she coyly said nothing. She became upset because he questioned her about cheating and told him to leave. He was standing over the toilet after urinating and Huppert was in the bathtub, when Huppert suddenly attacked him. Defendant claimed that she came at him with a blade or something. Defendant claimed that he defended himself but did not remember how he defended himself. Officer Swift described Huppert's injuries and asked defendant if he knew how she sustained them. Defendant said he did not know Huppert had been injured. Defendant never mentioned the toilet tank lid when telling Officer Swift about his defending himself. Officer Swift asked defendant if it was possible he struck Huppert with the toilet tank lid, but did not

11

remember because he blacked out during the altercation. Defendant responded that it was a possibility.

Officer Swift observed that defendant appeared to be "a little bit under the influence," but not to the point he was unable to communicate.

## Verdict and Sentencing

On September 20, 2011, the jury found defendant guilty on all counts except count five, making criminal threats, and found all enhancement allegations true. In the interim prior to sentencing, defendant substituted his counsel for another attorney to represent him during the sentencing phase and in any post-judgment motions.

On September 26, 2012, the trial court sentenced defendant to 12 years in prison, calculated as follows: the midterm of seven years on count one, attempted murder, and five consecutive years for the domestic violence GBI enhancement. The trial court stayed execution of sentence on the remaining counts and enhancements pursuant to section 654.

## DISCUSSION

### I. Juror Misconduct

### A. Additional Background and Defendant's Contentions

At the beginning of trial, the court instructed the jury: "During the trial do not speak to the defendant, witness, lawyer or anyone associated with them."

Later in the trial, Juror Number 6 informed the court that she had a conversation with one of the witnesses, Officer Swift, in the courthouse hallway. Officer Swift had already testified for the prosecution and would later testify during the prosecution's rebuttal case. The court examined the juror outside the presence of the rest of the jury. The juror explained that she did not recognize Officer Swift.[6] There were a lot of police

_____

[6] Officer Swift's testimony in the prosecution's case-in-chief was brief. In the nine pages of transcript reflecting his testimony, Officer Swift testified about going to the

12

officers in the hallway. She said, "We were talking computers and my parents up in the hills and how hard it is for -- to get along without me being there. And *he interjected* about . . . a computer program that I can buy that I can actually access their computer. And he was telling me that, about the computer program." Officer Swift was dressed in his uniform. She explained that their conversation lasted approximately two to three minutes. She further explained that Officer Swift did not identify himself as a witness and they did not discuss any aspects of the case. The court asked her whether the conversation affected her impartiality, and she said that it would not.[7]

The court then questioned Officer Swift about the conversation. He confirmed that the conversation was about computers and parents. Officer Swift admitted that he knew he was speaking with a juror but denied any wrongdoing because they discussed an unrelated matter. After questioning Officer Swift further about the substance of the conversation, the court admonished him, "You're wrong about what your duties are. You absolutely should have no conversation with any juror in any trial."

Following the colloquy with the juror and Officer Swift, the court discussed the situation on the record with counsel. Defense counsel contended that Officer Swift was a key witness and in defendant's view, was less than professional in interviewing defendant, particularly about his sexual orientation. Defense counsel did not request that the jurors be excused, but stated for the record that he was "concerned" that the juror might give "undue weight and credibility to the officer because he assisted them with information and/or knowledge in reference to their parents." However, counsel also said

___

hospital where defendant was treated on a domestic violence call, his observations of defendant's injuries and taking custody of a ceramic splinter removed from his arm.

[7] The court similarly questioned an alternate juror who participated in the hallway discussion but did not participate in deliberations. Defendant concedes that because the alternate did not participate in the deliberations, "his participation in the conversation is not relevant to this issue."

he thought the court "appropriately questioned all three and got the assurance from the [jurors] that they could remain fair."

The court found that while the hallway conversation was misconduct, "[i]t's not at the heightened or higher end of misconduct because in the first instance the jurors really didn't know he was a witness," particularly with respect to Juror Number 6.[8] The court characterized the level of misconduct as "sort of at the lower end." The court then noted, "it troubles me also that an officer thinks that he can engage jurors in conversations on items unrelated to the case. That is simply not the law." The court went on to find that the jurors' responses did not indicate that they were prejudiced by the conversation or that it would be unfair to defendant for them to remain on the jury. The court stated, "I don't find that the conduct that the jurors and the officer engaged in would warrant a mistrial or something to that effect at this time." Defense counsel registered no objection to the trial court's ruling.

Defendant contends on appeal that the trial court "erred and violated his constitutional rights when it did not excuse Juror [Number 6] after it was revealed that she had [] a conversation with Officer Swift out in the hallway."[9] Specifically, he asserts that because Officer Swift was one of only seven witnesses who had testified at the time of the hallway conversation, "it simply is not believable that Juror [Number 6] did not

---

[8] The court entertained greater concerns about the alternate, who admitted he did recognize Officer Swift as a witness.

[9] We note that the testifying officer also engaged in misconduct in this case, albeit likely nonprejudicial for the same reasons discussed below. Indeed, it appears that he injected himself into a conversation Juror Number 6 and the alternate were having. Officer Swift should have known that it was inappropriate to have a hallway conversation with a juror. However, defendant has not raised any issue regarding the officer's conduct or jury tampering on appeal. (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [it is not appellate court's function to address arguments not raised on appeal]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466 [appellate review limited to issues that have been adequately raised and supported in appellant's brief].)

recognize Officer Swift as a witness in the case." He contends that this misconduct raised a presumption of prejudice, which was not rebutted. Based on this improper witness contact between a juror and a witness for the prosecution, defendant now contends that he was denied due process and a fair trial. We disagree.

**B. Analysis**

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).) A defendant is deprived of the right to an impartial jury even if only one juror is biased. (*People v. Nesler* (1997) 16 Cal.4th 561, 578.)

A juror's misconduct "generally raises a rebuttable presumption that the defendant was prejudiced and may establish juror bias. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 95 (*Merriman*).) "[T]he presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. [Citations.]" (*Id*. at p. 95.) "Our inquiry in this regard is a 'mixed question of law and fact' subject to independent appellate review. [Citation.] But ' "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citation.]' " (*Id*. at pp. 95-96.)

Our high court has made it clear that, "when misconduct is ' " 'of such a trifling nature that it could not in the nature of things have been prejudicial to the moving party and where it appears that the fairness of the trial has been in no way affected by such impropriety, the verdict will not be disturbed.' " ' " (*People v. Stewart* (2004) 33 Cal.4th 425, 510 (*Stewart*), quoting *People v. Miranda* (1987) 44 Cal.3d 57, 118 (*Miranda*).)

In *Stewart*, a juror saw a witness in a courthouse restroom and told the witness, " ' "We're not supposed to have any contact but I just wanted to tell you that you're a very beautiful woman." [The witness] replied, "I don't feel so beautiful right now." ' " (*Stewart*, *supra*, 33 Cal.4th at p. 509.) The witness had been defendant's friend and she had testified against defendant under grant of immunity. (*Id*. at p. 438.) The juror stated in a declaration submitted as evidence in a new trial motion, that the brief contact did not affect her ability to be fair in the case. (*Id*. at p. 510.) The Supreme Court held that the juror committed misconduct, but it was " 'trifling' " misconduct that could not have prejudiced the juror. (*Ibid*.) In *Merriman*, the Supreme Court characterized the misconduct in *Stewart* as a "technical violation" of the admonition not to discuss the case with non-jurors. (*Merriman*, *supra*, 60 Cal.4th at p. 98.)

In *Miranda*, a juror repeatedly had conversations with a defendant's girlfriend, who attended the trial as a spectator. The juror testified, that the girlfriend first approached him and handed him a note which said he could call her. He knew she was a friend of the defendants because he had seen her conversing with them during the trial. The juror called the girlfriend several times, but denied that they ever discussed the case. He stated that they only talked about " 'going out.' " The girlfriend said she could not go out until the case was over. After the death penalty verdict in this capital case was returned, the juror called the girlfriend expecting to set up the date, but she refused, and he never spoke with her again. (*Miranda*, *supra*, 44 Cal.3d at p. 116.) Our high court affirmed the trial court's denial of the defendant's new trial motion because the misconduct was " ' "of such a trifling nature" ' " that it could not have been prejudicial. (*Id*. at p. 118.)

In *People v. Ryner* (1985) 164 Cal.App.3d 1075 (*Ryner*), a police witness conversed with some of the jurors outside the courtroom during a recess break in the officer's testimony. (*Id*. at p. 1080.) The topics of conversation included, a recent 49er playoff game, the kind of gun he carried, weapons in general, the officer's experiences on

the Oakland and San Jose Police forces, his Vietnam military service, and the fact that the officer was fatigued after working graveyard shift the night before. (*Ibid*.) They did not talk about his testimony or the case. (*Ibid*.) The appellate court concluded that the conversation involved " 'mere social amenities' " and was so brief and innocuous that the court considered it "trivial misconduct." (*Id*. at p. 1083.) The court went on to hold that "[g]iven the strength of the prosecution's case, the trifling nature of the misconduct and its minimal impact upon the case," there was no actual prejudice. (*Id*. at p. 1084.)

We agree with the trial court here that Juror Number 6 committed misconduct by speaking with a witness. We also agree that the misconduct raised a presumption of prejudice. However, we conclude that the presumption has been rebutted. The record shows Officer Swift spoke only briefly with Juror Number 6 about caring for aging parents and computer programs that might assist with that care. That was the extent of the conversation. This particular conversation did not produce prejudice because it was very brief, added nothing to the evidence at trial, and did not relate in any way to the issues at trial. The trial court appropriately questioned the juror about her ability to remain impartial, and she assured the court that she could continue to be fair and impartial. Additionally, we note that the trial court asked defense counsel for his thoughts, and counsel stated that, although he was "concerned," he thought the court "got the assurances from the [jurors] that they could remain fair," a detail defendant omitted from his appellate briefing. Significantly, defense counsel, who along with the trial court, observed Juror Number 6's demeanor during the misconduct hearing and her assurance that her impartiality had not been tainted, did not request the juror's exclusion or a mistrial.

The misconduct here was more trivial than the misconduct in *Miranda* and similar to that in *Stewart* and *Ryner*. Like in *Ryner*, the encounter here involved " 'mere social amenities.' " (*Ryner*, *supra*, 164 Cal.App.3d at p. 1083.) Consequently, we view the misconduct here to also be " ' " 'of such a trifling nature that it could not in the nature of

17

things have been prejudicial to' " ' " defendant.  (*Stewart*, *supra*, 33 Cal.4th at p. 510, quoting *Miranda*, *supra*, 44 Cal.3d 57 at p. 118.)

Moreover, the evidence against defendant was strong.  Huppert's version of events was generally more consistent with her initial report than defendant's version with his initial report.  Additionally, Huppert's testimony was more consistent with the evidence and in particular, the fact that Huppert ran into a neighbor's house naked, bloody, and hysterical, yelling that her boyfriend was trying to kill her.

Defendant contends that the conversation "likely" caused Juror Number 6 to view Officer Swift as "likeable and perhaps more credible by virtue of him being personally nice to her by giving her information on how she could help her elderly parents." However, as we have noted, the juror said the encounter did not affect her impartiality. The trial court believed this assertion and we defer to the trial court's credibility determinations when supported by substantial evidence.  (*Merriman*, *supra*, 60 Cal.4th at pp. 95-96.)

Given the strength of the prosecution's case, the trifling nature of the misconduct and the fact the juror credibly and unequivocally stated that the encounter had no impact on her ability to be fair and impartial, we conclude the misconduct here was not prejudicial.

## II.  Instructional Error Contention – Heat of Passion
### A.  Background and Defendant's Contentions

Because defendant's theory of the case was self-defense, the court instructed the jury on self-defense using CALCRIM No. 3470 and the lesser included offense to attempted murder, attempted voluntary manslaughter based on imperfect self-defense, using CALCRIM No. 604.  However, neither defendant nor the prosecutor requested an instruction on the lesser included offense of attempted voluntary manslaughter based on heat of passion, and the court did not give this instruction sua sponte.

18

Defendant contends the trial court erred in failing to instruct sua sponte on attempted voluntary manslaughter based on sudden quarrel or heat of passion as a lesser included offense of attempted murder (heat of passion instruction). Defendant argues there was substantial evidence supporting the instruction. In defendant's statement to Officer Swift, he said he went to Huppert's house because he suspected her of cheating on him because she had not answered his phone calls. When he arrived, he saw a man leave her house and when he went inside, he found that she was taking a bath, which made him think she had just been intimate with another man. Defendant asserts this evidence and Huppert's testimony about defendant becoming suddenly angry with her supported a finding that defendant acted under the heat of passion. The contention lacks merit.

## B. Analysis

"In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises. [Citation.] ' "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" ' [Citation.] '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 623.)

"Voluntary manslaughter is a lesser included offense of murder. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.) Attempted voluntary manslaughter is thus a lesser included offense of attempted murder. (See *People v. Williams* (1980) 102 Cal.App.3d 1018, 1026.) "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would

19

cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) "[P]rovocation is sufficient [when] . . . it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment. If an ordinary person of average disposition, under the same circumstances, would also react in this manner, the provocation is adequate . . . ." (*Id*. at p. 950.) " 'Adequate provocation . . . must be affirmatively demonstrated.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).) Thus, heat of passion requires provocation by the victim and includes a subjective component and an objective component related to that provocation. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) To satisfy the subjective component, " 'defendant must actually, subjectively, [attempt to] kill under the heat of passion.' " (*Ibid.*) To satisfy the objective component of this theory, "[t]he victim's conduct 'must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 561-562 (*Moye*).) In this case, there was no evidence of provocation sufficient to warrant an instruction on the heat of passion theory.

Huppert's testimony does not supply evidence to support the objective component of the heat of passion instruction. She testified that she let defendant in to talk while she took a bath but grew uncomfortable because defendant was very drunk and began accusing her of infidelity. She also testified that defendant began breaking things. Based on Huppert's testimony, she did nothing and said nothing that would provoke an average sober person to become so inflamed that he or she would lose reason and judgment. (Cf. *Thomas*, *supra*, 53 Cal.4th at p. 813; *Moye*, *supra*, 47 Cal.4th at pp. 561-562.)

Additionally, her testimony that defendant told her that he came to her home to kill her and locked the door indicated that defendant planned to harm her and was not subjectively caught up in the heat of passion.

Furthermore, the heat of passion instruction was inconsistent with defendant's defense, and his testimony did not support a finding that he subjectively acted in the heat of passion. At trial, he claimed that he became "frustrated" because Huppert was not a good "communicator," but he did not describe himself as angry. Indeed, he minimized his alleged concern about Huppert seeing another man. When defendant was asked if he would be angry if he found out that Huppert was cheating, defendant responded, "That would perturb me, but I don't think it would bring me to anger." Further, when asked whether he called Huppert so many times because he was jealous that she might be with another man, defendant responded, "I could have any woman I want, sir." Defendant testified that he went to Huppert's home because he was concerned about her, remorseful about their prior argument, "felt disconnected" from her, and concerned that she was "possibly" seeing another man. Additionally, he testified that his concerns were assuaged when he found that no one was with Huppert in her home and he denied any suspicions stemming from the fact she was taking a bath. He did not testify that he acted from passion when he struck her; he did not describe himself as upset or provoked in any way. Thus, according to defendant's testimony, his reason was not subjectively obscured as the result of a strong heated response to provocation. (Cf. *Thomas*, *supra*, 53 Cal.4th at p. 813.)

Moreover, the evidence of adequate provocation by the victim is lacking even under defendant's new theory. To satisfy the test of provocation -- provocation sufficient to cause an ordinary person of average disposition to act rashly without due deliberation and reflection and from passion rather than judgment -- "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) Thus, heat of passion requires evidence that the victim said or did

21

something to arouse the passions in an ordinary person of average disposition. In contrast to the cases defendant cites where a defendant caught his *spouse* in an act of infidelity or the *spouse* taunted the defendant about an affair or subjected the defendant to sexual insults, there is no such evidence in this case. Here, the victim was a girlfriend, not a spouse. Even based on defendant's statement to Officer Swift, she did not taunt him about being unfaithful. Nor did she even say she had been unfaithful. Nor were there any sexual insults. What set defendant off under his newly hatched heat of passion theory is that Huppert did not answer his phone calls, he claimed to Officer Swift that he saw a man leave her home, and she was taking a bath when defendant entered her home.[10] Yet, defendant testified that he only saw a man "near" Huppert's house, not walking from it, and that seeing she had been taking a bath did not make him think she was cheating on him. He also testified he was prepared to walk away if he found a man in her house, and he figured if Huppert were to cheat on him, it would be with another woman.

In any event, in our view, a former girlfriend not answering or ignoring phone calls, a male walking near her home or leaving her home and her taking a bath is not sufficient provocation to support a heat of passion instruction. Defendant may have been suspicious and he may have been jealous, but these facts do no amount to adequate provocation. Defendant was not entitled to a heat of passion instruction.

Even if we were to conclude that the trial court erred in not giving the heat of passion instruction sua sponte, any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Beltran*, *supra*, 56 Cal.4th at pp. 955-956.) "[T]he *Watson* test for

---

[10] Defendant does not highlight and neither party discusses defendant's statement to Officer Swift that he saw a man leaving Huppert's home, but we assume this is part of what defendant means in his brief when he says he told Officer Swift he suspected Huppert had been cheating on him.

22

harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]" (*Id.* at p. 956.)

Here, it is unlikely the jury would have concluded that the purported provocation caused an "ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 942.) The evidence showed that defendant was suspicious and jealous about a former girlfriend being intimate with someone else after their breakup. He spent much of the day trying to contact her and watching a home-made pornographic movie of the two of them. The only factual component here that arguably elevates ignoring phone calls and taking a bath to amount to provocation is defendant's statement to Officer Swift that he saw a man leave Huppert's home. Yet when he testified, he said there was a man walking "near" her home, not from it. In any event, defendant minimized this alleged concern repeatedly in his testimony. Instead, he testified he was prepared to leave if he found a man in Huppert's home and was relieved to find no one there. And he testified the fact that Huppert was taking a bath did not make him think she was cheating.

It is not reasonably possible that the jury would have believed defendant's statement about this mystery man or that there was sufficient provocation given his trial testimony, given the fact that Huppert mentioned nothing about someone else leaving her home before defendant arrived, and given the jury found defendant to lack credibility when it rejected the more recent version he gave in his trial testimony (self-defense). Any error in not instructing on the lesser included offense of voluntary manslaughter based on heat of passion was harmless.

23

### III. Ineffective Assistance of Counsel

### A. Defendant's Contentions

Defendant asserts he received ineffective assistance of counsel. Specifically, he claims that his counsel failed to request a jury instruction that voluntary intoxication could affect his ability to form the specific intent to kill, CALCRIM No. 3426. He argues that there was substantial evidence supporting a voluntary intoxication instruction based on Huppert's testimony that she noticed alcohol on defendant's breath and described him as "really drunk," a 10 on a scale of intoxication from 1 to 10.

Based on the failure to request the voluntary intoxication instruction, defendant claims he received constitutionally ineffective assistance of counsel.[11] We disagree.

### B. Analysis

To establish ineffective assistance of counsel, a defendant must show: (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

#### 1. Deficient Performance

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the

---

[11] This theory of ineffective assistance of counsel was not advanced by defendant in his new trial motion in the trial court.

right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Richter*, *supra*, 562 U.S. at p. ___ [178 L.Ed.2d at pp. 642-643].) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925 (*Weaver*).)

In this case, there is evidence that defendant's trial counsel made a reasonable tactical decision in not seeking a voluntary intoxication instruction. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) A voluntary intoxication instruction is warranted only "when there is substantial evidence of the defendant's voluntary intoxication *and the intoxication affected the defendant's 'actual formation of specific intent.'* [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 677 (*Williams*), italics added.)

The defense's theory of the case was that defendant acted in self-defense. Defendant testified that he was clearheaded and not intoxicated while he was at Huppert's home and had only consumed one shot of whiskey over the course of two and a half hours before arriving there. He said he was not affected by alcohol the entire time he was there, and he never claimed he was too inebriated to form the requisite intent. Instead, he contended that Huppert attacked him and he merely defended himself. Accordingly, trial counsel had a tactical reason for not requesting the instruction: it was inconsistent with defendant's testimony and inconsistent with his defense of complete or perfect self-defense.

*People v. Simpson* (1987) 192 Cal.App.3d 1360, 1369, is instructive on this point: "A voluntary intoxication instruction would have been inconsistent with [defendant's] theory of the case. Where the defense theory is nonparticipation, the question of whether

25

voluntary intoxication prevented formation of specific intent is irrelevant." Although instructions on inconsistent theories are not prohibited (*People v. Sedeno* (1974) 10 Cal.3d 703, 716-717, overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 178, fn. 26), trial counsel could plausibly elect to proceed on the single theory as a matter of trial tactics.

### 2. Prejudice

Defendant contends that because he was convicted, the jurors likely believed Huppert's testimony that defendant was very drunk and based on this testimony, "it is reasonably probable [the jury] would have concluded that he was too drunk to form the requisite specific intent to kill and found him not guilty of attempted murder." Again, we disagree.

Assuming trial counsel's decision not to request a voluntary intoxication instruction was incompetent under prevailing professional norms, we conclude that defendant was not prejudiced.

To establish prejudice, "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 562 U.S. at p. ___ [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

Here, it is not reasonably probable that defendant would have obtained a more favorable result but for his counsel's failure to seek a voluntary intoxication instruction. As we have discussed, defendant repeatedly denied that he was intoxicated. Additionally, defendant called Huppert multiple times after she broke up with him, came to her house without notice, locked the door behind him, and announced his intent to kill

26

her before smashing a toilet tank lid over her head. This is significant evidence of both motive and planning, and it negates the notion that defendant's consumption of alcohol prevented his actual formation of the specific intent to kill her. As the Supreme Court reasoned in *Williams*, even where there is substantial evidence of intoxication, where there is "no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent," the instruction is not warranted. (*Williams*, *supra*, 16 Cal.4th at pp. 677-678.) Accordingly, had defense counsel requested the instruction and had the court given it, it is not probable that defendant would have obtained a better result.

We cannot conclude that but for defense counsel's alleged deficient performance, there was a reasonable probability of a more favorable result. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.) Defendant has not demonstrated that his counsel's performance was deficient or that he was prejudiced. Consequently, we reject his ineffective assistance claim.

## IV. Motion for a New Trial

### A. Background and Defendant's Contentions

After several continuances and substituting his counsel, approximately one year after trial, defendant filed a motion for a new trial based on multiple allegations of ineffective assistance of counsel.

### 1. Ineffective Assistance of Counsel Claims Raised in the Trial Court

Defendant raised four grounds for ineffective assistance. First, he contended that his trial counsel was ineffective in failing to counter the prosecution's medical expert by introducing expert testimony that Huppert's injuries were inconsistent with being repeatedly struck in the face and with being struck on the head with a toilet tank lid. Defendant attached a declaration from Dr. Bennet Omalu stating that if called as an expert witness, he would have testified that Huppert's injuries were inconsistent with her testimony and more consistent with defendant's testimony. Second, defendant contended that his counsel failed to call Uy, who could have impeached Huppert's credibility by

testifying about several contradictions in her testimony, her drug use, the reason she moved out was because of her use of drugs in the residence and her propensity for violence. Defendant argued that Uy's testimony about Huppert's violent character would have been admissible under Evidence Code section 1103, subdivision (a), to show that Huppert was the aggressor and supported defendant's claim that he acted in self-defense. Third, defendant argued that his counsel failed to adequately prepare him to testify in his own defense. Finally, defendant contended that his counsel should have moved to exclude evidence that defendant was involved in the pornography industry because the evidence was highly prejudicial and minimally relevant.

### 2. The Prosecution's Opposition and Trial Counsel's Explanations

The People responded to defendant's motion with a declaration from defendant's trial counsel, which addressed each of defendant's contentions. Counsel declared that he made a tactical decision to not call a medical expert as a rebuttal witness for several reasons. Counsel said he did not want "to focus on [] Huppert's injuries or how they occurred, but to instead focus on [] Huppert's jealous rage in attacking [defendant] and his need to defend himself."

Regarding his decision not to have a defense expert testify about Huppert's injuries, counsel explained: "[T]his decision was based on [defendant's] statements to me that in using the toilet lid as a shield to defend himself from [] Huppert's attack, he *did* hit (but not smash) her in the head with the toilet lid. However, as he explained, her injuries and bleeding occurred from her falling and hitting her head on the tub. [¶]. . .[¶] [Defendant's] statement to me concerning hitting [] Huppert in the head was consistent with his statement contained in the police report wherein he admitted that it was possible that he struck [] Huppert over the head with the toilet tank lid and just did not remember doing so because he blacked out." Additionally, counsel noted that he elicited testimony from two of the prosecutor's medical witnesses admitting that the medical evidence was also consistent with defendant's version of events: "It should be noted that Dr. John

28

Richards, the emergency room physician, testified that [] Huppert's head laceration was consistent with having a toilet lid smashed down on her head. He further testified that her injuries could have also been sustained by falling and hitting her head on the side of the tub or wall. Moreover, [defendant's] treating physician (Dr. Anthony Occhipinti) testified that [defendant's] injuries were consistent with an object shattering in his hands, and that all of [defendant's] injuries were consistent with a scenario in which a person defends himself and slips on a wet bathtub in the process, with the toilet lid falling on his hand." For these reasons, counsel decided to "focus on [] Huppert's jealous rage in attacking [defendant] and his need to defend himself" rather than "focus on [] Huppert's injuries or how they occurred."

The People further contended that trial counsel's decision not to present Uy's testimony was reasonable. In his declaration, counsel stated that he considered using Uy's testimony to impeach Huppert but decided against it because: (1) Huppert had already been significantly impeached on cross examination; and (2) "Uy's honest responses regarding [defendant's] behavior that night (and on other occasions when [defendant] had been drinking heavily) would be very damaging to [defendant]." Additionally, the People contended that Uy's testimony would have been impeached with his inconsistent statements during the preliminary hearing and with his own admission that he was jealous of Huppert.

The People also asserted that defendant was well-prepared for trial. In support, trial counsel declared that he advised defendant from the beginning of his representation that "in all likelihood he would have to testify to present the defense of self-defense." Further, counsel declared that defendant wanted to testify and "cited his acting and stage experiences as confirmation of his extraordinary ability to 'perform on the witness stand.'" Counsel declared that at defendant's request, he provided defendant over 90 typed questions that he would likely ask on direct examination because defendant said that "he could perform better if he had a 'script.'"

29

Finally, regarding the evidence defendant had been a pornographic movie actor, the People argued that "the decision to play up [defendant's] past theatrical and film background as well as his sexual prowess was calculated to A) provide star power to his presentation to the jury and B) establish a motive for the jealousy and anger [d]efendant attempted to saddle [] Huppert with." Trial counsel declared that it was important to provide the jury with an explanation about why Huppert would suddenly attack defendant. Defendant informed trial counsel that "it was his fame, attractiveness, and sexual prowess that caused [] Huppert to track him down (via his agent) and rekindle the relationship." Counsel declared that defendant wanted to introduce his centerfold in Playgirl Magazine as proof of his fame and to support his theory that Huppert was obsessed with him. Accordingly, counsel declared that "to counter the prosecution's theory that [defendant] was the aggressor and jealous one, presenting evidence of his work in the pornography industry tended to support his belief and trial testimony wherein he testified that 'I can have any woman I want.' "

### 3. The Trial Court's Ruling

After considering both written and oral argument on defendant's motion for a new trial, on September 26, 2012, the trial court denied the motion. The court analyzed each of defendants' allegations of ineffective assistance of counsel. First, the court ruled that trial counsel made a reasonable tactical decision to not present medical expert testimony because he did not want to focus on Huppert's injuries. The court reasoned that because "the injuries were galling, and they were numerous in this case," it was reasonable for counsel to steer his case away from further testimony about her injuries. Second, the court found that defendant appeared adequately prepared for trial and was "very polished" in his testimony. Third, the court ruled that trial counsel made a reasonable decision to not present Uy's testimony because he would have been impeached with his testimony during the preliminary hearing and may have hurt defendant's case with testimony about defendant's past violent behavior when under the influence of alcohol.

30

Accordingly, the court accepted trial counsel's explanation for the decision to not present Uy's testimony. Finally, the court ruled that defendant's involvement in pornography was relevant to the defense's theory of the case, including his testimony that he could have any woman he wanted.

In its ruling, the court noted that "during voir dire we questioned the jurors extensively in regards to questions concerning, you know, someone's sexuality, and that's why we did that, because we know that that would become an issue during the course of this trial." The court also noted that defendant's testimony was "quite compelling" and that trial counsel "did a great job." Accordingly, the court found that counsel made "sound tactical decisions" and denied defendant's motion for a new trial.

### 4. Defendant's Ineffective Assistance of Counsel Claims on Appeal

Defendant contends the trial court erred in denying his motion. In doing so, he renews his claims that trial counsel rendered ineffective assistance by failing to (1) introduce expert medical testimony to rebut the prosecution's medical testimony, (2) call Uy to testify, and (3) seek exclusion of evidence that defendant participated in pornographic films.[12] He argues that absent counsel's purported failings, there is a reasonable probability that he would not have been convicted. We are not persuaded.

### B. Analysis

In reviewing the denial of a motion for a new trial raising ineffective assistance of counsel claims, we uphold the trial court's factual findings if they are supported by substantial evidence, and we exercise our independent judgment on the legal issues. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.) As we have discussed, *Strickland*'s high bar requires that a defendant establish both deficient performance and prejudice. (*Strickland*, *supra*, 466 U.S. at pp. 693-694.) Here, we need not guess about

---

[12] Defendant has not asserted on appeal that counsel failed to adequately prepare him to testify as a ground for ineffective assistance.

31

trial counsel's tactical reasons for these decisions because we have counsel's declaration explaining his thinking for each decision. Having the benefit of a thorough explanation from trial counsel for his decisions, we are not persuaded that counsel's performance was deficient on any basis.

### 1. Decision not to Introduce Expert Medical Testimony

Dr. Omalu stated in his declaration that Huppert's injuries were inconsistent with her testimony that defendant struck her in the face over 60 times. It was not medically feasible that she would be hit in the head and face that many times and sustain limited abrasions, contusions, and lacerations. Dr. Omalu also opined that the absence of skull fracture and other trauma to Huppert's scalp was inconsistent with her testimony that defendant raised the toilet seat lid over his head and slammed it violently on top of her head. According to defendant, "[Dr.] Omalu would have shown that Huppert was a liar when it came to describing what appellant did to her."

As for Huppert's testimony she had been struck more than 60 times in the head, an expert opinion is not necessary to establish that her injuries were inconsistent with that claim. The jury likely discounted this testimony.

As for Dr. Omalu's opinion concerning the absence of a skull fracture, we find no evidence in the record he was available to testify or that there is anyone else with his extensive qualifications[13] who would have been available to testify as to the same

---

[13] Dr. Omalu is a physician with board certifications in anatomic pathology, clinical pathology, forensic pathology, neuropathology, and medical management. He has a master's degree in public health and another in business administration. He has performed over 6,000 autopsies and examined over 10,000 brains. He had been retained as an expert witness in "thousands of criminal and civil cases from across the United States in federal, state and county courts and jurisdictions." He testifies in over 60 criminal and civil trials and depositions a year involving both deceased individuals and living patients. He is a professor of laboratory medicine and medical pathology at UC Davis and has "published extensively in the medical literature with a focus on traumatic brain injury."

opinion. Other less qualified experts who may have been available may not have been willing to give the same opinion. Indeed, Dr. Richardson, a 19-year emergency room physician who sees head trauma on almost every shift, but who was not as well credentialed as Dr. Omalu based on the evidence, was of a different opinion.

In any event, we agree with the trial court that, consistent with counsel's declaration, it was a reasonable tactical decision within the "wide range of reasonable professional assistance" to not present medical expert testimony and focus on Huppert's injuries. Counsel explained: "[T]his decision was based on [defendant's] statements to me that in using the toilet lid as a shield to defend himself from [] Huppert's attack, he *did* hit (but not smash) her in the head with the toilet lid.[14] However, as he explained, her injuries and bleeding occurred from her falling and hitting her head on the tub. [¶]. . .[¶] [Defendant's] statement to me concerning hitting [] Huppert in the head was consistent with his statement contained in the police report wherein he admitted that it was possible that he struck [] Huppert over the head with the toilet tank lid and just did not remember doing so because he blacked out." This strikes us as the quintessential reasonable tactical decision. Trial counsel cannot reasonably be expected to present expert testimony that is inconsistent with his client's statements in both the police report and in a subsequent client interview.

Further, trial counsel elicited equivocal testimony from both Dr. Richards and Dr. Occhipinti about the cause of Huppert's and defendant's injuries. Both testified on cross-examination that Huppert and defendant's respective injuries were consistent with defendant's story. Neither doctor could say definitively which version of events was more consistent with the injuries. After his thorough cross-examination eliciting favorable testimony, trial counsel may have reasonably decided that it was unnecessary to

---

**14** We note that Dr. Omalu did not have the benefit of this inside information when he formed his opinion.

33

rebut the prosecution's medical expert testimony. This is another valid tactical reason for counsel's decision. As the United States Supreme Court has observed, "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence. . . . There are, however, 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' [Citation.] Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." (*Richter*, *supra*, 562 U.S. at p. ___ [178 L.Ed.2d at p. 643].) And we note the high court has emphasized, "the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Id.* at p. 642.) Even if trial counsel's decision was outside the "wide range" of professional assistance and thereby incompetent under prevailing professional norms, it was not prejudicial. Because trial counsel established that defendant's version of events was consistent with the injuries, it is unlikely that the introduction of further testimony to that effect would have resulted in a better outcome. Accordingly, defendant has not demonstrated a reasonable probability that he would have received a more favorable result had his trial counsel called Dr. Omalu or some other expert who could render the same opinions as Dr. Omalu. (See *Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)

## 2. Decision not to Call Leo Uy as an Impeachment Witness

We also agree with the trial court that defendant's counsel had good tactical reasons for not calling Uy as an impeachment witness. As trial counsel stated in his declaration, Uy would have been impeached with the testimony he gave at the preliminary hearing and may have hurt defendant's case with testimony about

defendant's past violent behavior. Indeed, during the preliminary hearing, Uy testified that Huppert was never violent with defendant. Counsel specifically declared that before presenting the defense's case-in-chief, he and defendant discussed the " 'pros and cons.' " of calling Uy as a witness and decided that Uy's impeachment value was minimal where Huppert had already been significantly impeached and Uy's honest testimony would potentially damage defendant's case. And we note that Uy would have been viewed as having a bias related to his relationship with defendant and his competition with Huppert for defendant's affections. The record thus discloses that trial counsel's decision was well-considered and reasonable.

Further, counsel's decision was not prejudicial. Uy's proposed testimony was to impeach Huppert's testimony on the peripheral matters of her knowledge of defendant's relationship with Uy and her participation in sexual acts with both men. Huppert was already significantly impeached on these matters. Additionally, Uy's proposed testimony that Huppert had a propensity toward violence was contradicted by his prior statements at the preliminary hearing and, accordingly, would not have significantly aided the defense. In light of these facts coupled with trial counsel's declaration that Uy's testimony about defendant's past behavior would have been "very damaging," defendant cannot demonstrate prejudice resulting from trial counsel's decision not to call Uy to testify.

### 3. Decision not to Seek Exclusion of Defendant's Involvement in the Pornography Industry

We agree with the trial court that defense counsel had a reasonable tactical reason for allowing evidence about defendant's pornography career. The defense's theory was that defendant's "fame, attractiveness, and sexual prowess" were the reasons Huppert sought to rekindle their relationship and ultimately, reacted with jealousy when defendant told her that he loved Uy more than he loved her. According to trial counsel's declaration, "it was important to provide the jury with an explanation as to why [] Huppert would suddenly attack [defendant]," that is, "the root causes of [] Huppert's

35

jealous and violent rage." Counsel declared that in order to "counter the prosecution's theory that [defendant] was the aggressor and jealous one, presenting evidence of his work in the pornography industry tended to support his belief and trial testimony wherein he testified that 'I can have any woman I want.' " These are reasonable explanations for counsel's tactical decision.

Further, it is unlikely that the testimony about defendant's history working in pornography was prejudicial. There was extensive evidence presented by both the defense and the prosecution about defendant's sexual history. In context, the testimony about defendant's past participation in pornography was not significantly more inflammatory than the detailed testimony about his work as a stripper, his bisexuality, group sexual acts, the sex swing, and related evidence. As the trial court noted, the jurors were extensively questioned during voir dire to ensure that the more explicit evidence would not prejudice defendant. Under these circumstances, it is unlikely that the brief testimony about defendant's work in the pornography industry more than twenty years prior to the instant case resulted in actual prejudice.

Finally, the fact that the jury did not convict him on count five, the criminal threats count, indicates that the jury fairly considered the evidence and was not prejudiced against defendant as the result of learning about defendant's history in pornography. Accordingly, we conclude that there was no prejudice sufficient to undermine our confidence in the result. (See *Ledesma*, *supra*, 43 Cal.3d at p. 218.)

On all three of his claims of ineffective assistance, defendant has failed to rebut the " ' "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*Weaver*, *supra*, 26 Cal.4th at p. 925.) Further, were we to conclude that defendant succeeded in demonstrating deficient performance, we would still conclude that he failed to meet his burden of showing prejudice. Accordingly, the trial court did not err in denying defendant's motion for a new trial based on ineffective assistance of counsel.

36

## DISPOSITION

The judgment is affirmed.


                                                  MURRAY        , J.


We concur:


      MAURO        , Acting P. J.


      HOCH        , J.